WR-63,871-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/15/2015 1:59:28 PM
Accepted 10/15/2015 4:15:30 PM
ABEL ACOSTA
CLERK

NO. C-2-010289-0764908-B

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NO. 2 OF |
| | § | |
| TIMOTHY RANDAL THOMPSON | § | TARRANT COUNTY, TEXAS |

COURT OF CRIMINAL APPEALS
10/15/2015
ABEL ACOSTA, CLERK

### STATE'S RESPONSE TO
### APPLICANT'S SUPPLEMENTAL HABEAS CORPUS CLAIM

COMES NOW, the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and files this response to the applicant's supplemental claim for habeas corpus relief.

The Case in Brief/Procedural History:

The applicant was convicted of murder on April 20, 2001, and sentenced to twenty-five years' confinement. See Judgment. The Court of Appeals affirmed the applicant's conviction finding that:

- The evidence was legally and factually sufficient;
- Trial counsel did not provide ineffective assistance by not requesting a sudden passion instruction;
- The trial court properly permitted the deceased's widow to remain in the courtroom;
- The trial court did not violate the applicant's substantial rights by permitting the deceased's mother to remain in the courtroom;
- The trial court properly excluded evidence regarding the deceased's violent conduct while under the influence of drugs;
- The trial court did not improperly comment on the evidence in

responding to the applicant's jury argument objection; and

- The trial court properly overruled the applicant's objections to the State's jury argument.

See *Thompson v. State*, Case No. 02-01-00202-CR (Tex. App. –- Fort Worth 2002, pet. refused) (not designated for publication).

The applicant previously filed an application for writ of habeas corpus on July 19, 2004, alleging that:

- The State used false and perjured evidence to obtain his conviction because the DNA testing results admitted during his trial lacked scientific validity;
- He was denied effective assistance because his counsels failed to challenge the State's DNA evidence or obtain an independent expert analysis to ascertain any scientific invalidity in the State's DNA evidence.

See *Ex parte Thompson*, No. C-2-006996-0764908-A (application). The trial court recommended that the applicant be denied relief on these claims. See *Ex parte Thompson*, No. C-2-006996-0764908-A (order adopting proposed findings of fact and conclusions of law). This Court dismissed this writ application on March 29, 2006. See *Ex parte Thompson*, No. WR-63,871-01 (white card).

On August 19, 2014, the applicant filed an application for writ of habeas corpus alleging that he was denied effective assistance of trial counsel. See *Ex parte Thompson*, No. C-2-010289-0764908-B (application). The trial court conducted live hearings on January 21, 2015, and January 30, 2015, in

2

which the applicant's two trial counsels – the Hon. Les Johns and the Hon. Leon Haley – each testified. See *Ex parte Thompson*, No. C-2-010289-0764908-B (habeas reporter's record).

On April 9, 2015, the applicant amended this application to add an allegation that he was denied effective assistance of appellate counsel. See *Ex part Thompson*, No. C-2-010289-0764908-B (amended application). The State filed its amended proposed findings of fact and conclusions of law on April 30, 2015. See *Ex parte Thompson*, No. C-2-010289-0764908-B (amended proposed findings of fact and conclusions of law). The trial court adopted the State's amended proposed findings of fact and conclusions of law on August 13, 2015. See *Ex parte Thompson*, No. C-2-010289-0764908-B (adoption order).

On September 24, 2015, the applicant filed a supplemental application for writ of habeas corpus alleging that his due process rights were violated by the State's use of false or perjured testimony during his trial. See *Ex parte Thompson*, No. C-2-010289-0764908-B (supplemental application)

Discussion:

The applicant contends that his due process rights were violated because the crime scene investigator presented false testimony.

**A.     Standard of Review**

The Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly.     See *Ex parte Chavez*, 371 S.W.3d 200, 207-08 (Tex. Crim. App. 2012); *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011); *Ex parte Chabot*, 300 S.W.3d 768, 770-71 (Tex. Crim. App. 2009); **U.S. Const. amend. XIV**. Testimony need not be perjured to constitute a due-process violation; rather, it is sufficient that the testimony was false.     *Ex parte Chavez*, 371 S.W.3d at 208; *Ex parte Robbins*, 360 S.W.3d at 459.     The question is whether the testimony, taken as a whole, gives the jury a false impression.     *Ex parte Chavez*, 371 S.W.3d at 208; *Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011); *Alcorta v. Texas*, 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).

To constitute a due-process violation, the record must show that the testimony was material; namely, that there is "a reasonable likelihood" that the false testimony affected the judgment of the jury.     *Ex parte Chavez*, 371 S.W.3d at 209; *Ex parte Ghahremani*, 332 S.W.3d at 478.     Materiality must be reviewed in light of the entire record.     *Ex parte Chavez*, 371 S.W.3d at 209-10.

**B.     Alleged False Statement**

The applicant contends that crime scene investigator Mark Ball gave false or perjured testimony when he testified that he searched the applicant's house on March 31, 2000, and did not find any bullets or bullet holes in the living room floor.     See Trial Reporter's Record IV:160-61, 178-79, 187.

On July 10, 2008, forensic scientist Edward Hueske examined the applicant's house where this murder occurred.     See *Ex parte Thompson*, No. C-2-010289-0764908-B (application – exhibit G).     During this examination, Mr. Hueske recovered two bullets from the house's living room floor.     See *Ex parte Thompson*, No. C-2-010289-0764908-B (application- exhibit G).

In February 2015, Mr. Hueske compared the bullets he recovered in 2008 with the semi-automatic pistol used by the applicant in this murder. See *Ex parte Thompson*, No. C-2-010289-0764908-B (amended application- exhibit H).     Mr. Hueske determined that, to a reasonable degree of scientific certainty, the bullets recovered from the living room floor were fired by or from the applicant's pistol.     See *Ex parte Thompson*, No. C-2-010289-0764908-B (amended application- exhibit H).


**C.     Investigator Ball Did Not Present False Testimony**

Investigator Ball did not present false testimony because he merely

testified about the search he conducted and what he did or did not find in searching the floors. See Trial Reporter's Record IV:160-61, 178-79, 187. Nothing from Mr. Hueske's discovery or examination demonstrates that Mr. Ball found bullets or bullet holes and lied about it to the jury, or that any other testimony by Mr. Ball was false. Mr. Ball even acknowledged on cross-examination that, given the bloody crime scene, there was a chance that he could have missed bullets or bullet holes while searching the floors. See Trial Reporter's Record IV:187. Thus, it cannot be said that Mr. Ball's testimony as a whole constituted false testimony.

**D.    Alleged False Statement Not Material to Conviction**

There is no reasonable likelihood that any falsity in Mr. Ball's testimony regarding his bullet/bullet hole search affected the applicant's conviction.

*1.    Quality of Crime Scene Investigation*

The applicant was not precluded from attacking the quality of the police crime scene investigation. As addressed above, Mr. Haley vigorously cross-examined Mr. Ball who ultimately admitted that he could have missed bullets or bullet holes when searching the living room floors. See Trial Reporter's Record IV:187.

6

The applicant raised further questions regarding the thoroughness of Mr. Ball's investigation when his original attorney – the Hon. Paul Sorenson – testified that, on April 23, 2000, he observed bullet holes in the living room floor. See Trial Reporter's Record V:105-06, VIII:Defense Exhibits #7-9. Mr. Sorenson even stated on cross-examination that he observed something he considered to be a bullet in the living room floor. See Trial Reporter's Record V:111. Mr. Johns emphasized Mr. Sorenson's discovery to the jury. See Trial Reporter's Record VI:11. Put simply, any such inadequacy was placed for consideration before the jury.

2. *Applicant Not Hampered From Presenting Warning Shot Aspect of Self-Defense Claim*

The applicant was not hampered from presenting the warning shot aspect of his self-defense claim before the jury by any inadequacies in Mr. Ball's crime scene investigation. The trial reporter's record shows that:

- The applicant testified that he first fired one round beside Mr. Walker and two rounds in front of him. See Trial Reporter's Record V:133.

- The appellant fired another round at the floor, but the bullet hit Mr. Walker in his foot. See Trial Reporter's Record V:134.

- After killing Mr. Walker, the applicant picked up five shell casings from the floor and put them in a cigarette package. See Trial Reporter's Record V:150-51.

7

- The five shell casings were introduced into evidence along with the gun.    See Trial Reporter's Record IV:201, 213-14.

Thus, the jury was not fully deprived of evidence supporting the appellant's warning shot claim despite Mr. Ball's inability to find bullets in the living room floor.

*3.    Applicant Not Hampered From Presenting General Self-Defense Claim*

The applicant was not hampered from investigating and presenting his general self-defense claim by any inadequacies in Mr. Ball's crime scene investigation.

Upon his appointment, Mr. Johns contacted Mr. Sorenson, and obtained a copy of his file.    See Habeas Reporter's Record II:25; Mr. Johns' Billing Statement, page 1.    Mr. Johns also had access to the police reports and the witness statements in the State's file.    See Habeas Reporter's Record III:13. Mr. Johns reviewed these materials to help formulate the appellant's defense. See Mr. Johns' Billing Statement, pages 1 & 2.    Mr. Johns obtained and used the services of private investigator Cliff Ginn in formulating the appellant's defense.    See Habeas Reporter's Record II:7-8, 25; Mr. Johns' Affidavit, page 1; Mr. Johns' Billing Statement, page 4; Mr. Ginn's Billing Statement, page 2.

Mr. Johns' defense investigation focused on why the applicant shot Mr.

Walker rather than who shot Mr. Walker since the applicant admitted to the shooting. See Habeas Reporter's Record II:26. Mr. Johns met with the applicant on numerous occasions who told him that:

- He and Mr. Walker did drugs together;

- Mr. Walker was substantially larger than him;

- Mr. Walker would not leave his house;

- Mr. Walker was agitated and threatened him;

- He was afraid of Mr. Walker; and

- He only pointed a gun at Mr. Walker after he threatened him.

See Habeas Reporter's Record II:9-10, 27-28. Mr. Johns' Billing Statement, pages 2-6. Mr. Johns and Mr. Haley chose to focus on the sixty-pound weight differential between the applicant (126 pounds) and Mr. Walker (186 pounds) and the applicant's statement that the applicant's gun discharged when Mr. Walker tried to grab it. See Mr. Johns' Affidavit, page 1.

During his trial, the applicant testified that:

- Mr. Walker was substantially larger than himself. See Trial Reporter's Record V:130.

- Mr. Walker became belligerent when he asked Mr. Walker to leave his house. See Trial Reporter's Record V:130-31.

- Mr. Walker threatened to sexually assault him with the gun and with his penis. See Trial Reporter's Record V:131-32.

9

- Mr. Walker jumped at the applicant which caused him to fire the gunshot that hit Mr. Walker's foot.   See Trial Reporter's Record V:134.

- Mr. Walker pulled him to the floor by his pants leg and grabbed his shoulder which caused him to fire the fatal gunshot.   See Trial Reporter's Record V:138, 178.

The applicant's self-defense claim was not predicated on whether the applicant fired a warning shot before shooting Mr. Walker in the foot.[12]

4. *Impact of Warning Shot Claim Undermined by Applicant's Conduct Following Alleged Warning Shot.*

Any impact from the applicant's warning shot claim was undermined by his own conduct after his initial warning shots; specifically evidence that:

- The applicant fired a gunshot into Mr. Walker's foot.   See Trial Reporter's Record V:134.

- The applicant followed Mr. Walker into the corner to get him to remove his shoe from his wounded foot.   See Trial Reporter's Record V:135-37.

- When Mr. Walker still refused to leave, the applicant began

---

1    During the course of Mr. Johns' representation, the applicant told him eight or nine different factual versions of how or why he shot Clayton Walker, including a new version on the morning of trial.   See Habeas Reporter's Record II:8; Mr. Johns' Affidavit, page 1.

2    The applicant also suggested an accident defense by testifying that the gun fired accidentally when he was trying to club Mr. Walker with it, and that he did not intend to shoot Mr. Walker.   See Trial Reporter's Record V:138, 186. This accident theory renders any earlier warning shot irrelevant and immaterial.

10

kicking his wounded foot.   See Trial Reporter's Record V:138, 177-78.

- The applicant was trying to club Mr. Walker with his gun when he fired the fatal shot.   See Trial Reporter's Record V:138.

Given the applicant's conduct, any inadequacies in Mr. Ball's crime scene investigation did not materially undermine the warning shot aspect of his self-defense claim.

5.   *General Self-Defense Claim Undermined by Applicant's Conduct Before and After Clayton Walker's Death.*

The applicant's self-defense claim was undermined by his own conduct before and after Clayton Walker's death; specifically evidence that:

- A nervous and anxious Clayton Walker pointed at the applicant's house and told Shelley Little that the applicant was trying to kill him.   See Trial Reporter's Record III:41-43.

- Ms. Little later observed the applicant drive his truck in pursuit of a fleeing Mr. Walker.   See Trial Reporter's Record III:44-45.

- The applicant shot Mr. Walker even though he never physically touched him.   See Trial Reporter's Record V:174.

- The applicant did not call the police after he shot Mr. Walker. See Trial Reporter's Record V:140.

- The applicant tried to clean up the crime scene with ammonia. See Trial Reporter's Record V:142.

- The applicant took the five shell casings from his living room floor when he left his house.   See Trial Reporter's Record V:150.

11

- The applicant told Rhonda Carlson and James Crafton that he had shot and killed someone for failing to "shut up". <u>See</u> Trial Reporter's Record IV:13, 37-38.

- The applicant laughed while discussing having shot Mr. Walker in the left temple. <u>See</u> Trial Reporter's Record IV:14-15, 41.

- The applicant sought help to dispose of Mr. Walker's body. <u>See</u> Trial Reporter's Record IV:14-15.

- The applicant told Michael Hendricks that he shot Mr. Walker in the head because he would not "shut up". <u>See</u> Trial Reporter's Record V:80.

- The applicant asked Mr. Hendricks to help him dispose of Mr. Walker's Body. <u>See</u> Trial Reporter's Record V:81.

Given the applicant's conduct, any inadequacies in Mr. Ball's crime scene investigation did not materially undermine the applicant's general self-defense claim.

*6. Ex parte Chabot Factually Distinguishable*

The factual situation in *Ex parte Chabot* is markedly different from the present case. In *Chabot*, the defendant and another man, Gerald Pabst went to the deceased's house looking for drugs and money related to a recent drug deal involving the deceased's husband. <u>See **Ex parte Chabot**, 300 S.W.3d at 769</u>. Pabst testified that Chabot sexually assaulted and killed the deceased while he was in another room. <u>See **Ex parte Chabot**, 300 S.W.3d at 770</u>.

12

Subsequent DNA testing proved that Pabst was the person who sexually assaulted the deceased. See *Ex parte Chabot*, 300 S.W.3d at 770. Thus, Pabst's testimony implicating Chabot was scientifically proven to be false.

Given these facts, *Ex parte Chabot* differs from the present case in several key aspects:

- Pabst's false statements were the key evidence against Chabot. See *Ex parte Chabot*, 300 S.W.3d at 770. Mr. Ball's crime scene investigation was just one piece of the evidence against the applicant.

- Pabst's factual allegation inculpating Chabot was scientifically proven to be false. See *Ex parte Chabot*, 300 S.W.3d at 770. Mr. Hueske's investigation and testing only showed Mr. Ball's testimony to be arguably inaccurate or his investigation to have been sloppy.

- Pabst's false statements were deliberately false. See *Ex parte Chabot*, 300 S.W.3d at 770. The record does not suggest that any inaccuracies in Mr. Ball's testimony were deliberately false.

- The *Chabot* jury was specifically instructed that it had to find Pabst's testimony to be true in order to convict Chabot. See *Ex parte Chabot*, 300 S.W.3d at 770. No similar jury instruction was given in this case.

*7. Conclusion*

There is no reasonable likelihood that any falsity in Mr. Ball's testimony affected the jury's judgment of conviction given that:

- His testimony about not "finding" any bullets or bullet holes was not proven false;

13

- The defense was not precluded from challenging the quality of his crime scene investigation;
- The defense was not hampered from presenting its self-defense claim; and
- The applicant's self-defense claim was actually undermined by his own conduct following Clayton Walker's death.

Thus, any false statement by Mr. Ball was not material to the applicant's conviction and did not violate his due process rights. See *Ex parte Chavez*, 371 S.W.3d at 208-10.

### E. Alleged False Statement Not Material to Sentencing

There is no reasonable likelihood that any falsity in Mr. Ball's testimony affected the applicant's sentence. In addition to the facts of this murder, the jury heard information that:

- Several months before Mr. Walker's murder, the applicant came to Jessie Little's door armed with two pistols and a longer gun, and claimed that Ms. Little tried to shoot her roommate. See Trial Reporter's Record VII:7-8.

- The applicant had previously been in rehabilitative treatment for drug addiction. See Trial Reporter's Record VII:3; VIII:State's Exhibits #70 & 71.

- The applicant had previously engaged in drug dealing. See Trial Reporter's Record VII:15; VIII:State's Exhibit #71.

- The applicant continued to use illegal drugs despite his family's numerous attempts to assist him. See Trial Reporter's Record VII:18, 21-22.

14

In other words, the jury heard evidence that imprisonment was the appropriate punishment for this murder. Thus, there is no reasonable likelihood that any falsity in Mr. Ball's testimony affected the jury's sentencing decision.

The factual situation in *Ex parte Ghahremani* differs greatly from this case. In *Ghahremani*, the only noteworthy punishment evidence came from the false testimony by the complainant's father solely attributing her changed behavior and her being sent to an intensive treatment boarding school due to her sexual assault by the defendant. See ***Ex parte Ghahremani***, 332 S.W.3d at 473-74, 480.[3] Here, the State presented significant evidence unrelated to Mr. Ball's testimony justifying the applicant's prison sentence.

Furthermore, unlike this case, the *Ghahremani* prosecutors knew or should have been aware that the father's testimony was false or misleading since they knew about the complainant's sexual relationship with the other man well before the defendant's trial. See ***Ex parte Ghahremani***, 332 S.W.3d at 474. While due process violations may occur with the unknowing use of false testimony, the State's knowledge is still a relevant factor in

---

3    The fifteen-year-old complainant in *Ghahremani* was also having sexual relations with a twenty-five-year-old man, which was another reason why the complainant was sent to the intensive treatment boarding school. See ***Ex parte Ghahremani***, 332 S.W.3d at 473-74.

determining whether a defendant's due process rights were violated.   See *Ex parte Ghahremani*, 332 S.W.3d at 478.[4]

In sum, any falsity in Mr. Ball's testimony was not material to the applicant's sentencing and did not violate his due process rights.   See *Ex parte Chavez*, 371 S.W.3d at 208-10.

### F.   Conclusion

The applicant's due process rights were not violated by Mr. Ball's testimony regarding his crime scene search for bullets and bullet holes.   Mr. Ball did not falsely testify before the jury regarding his crime scene investigation.   Alternatively, there is no reasonable likelihood that any falsity in Mr. Ball's testimony affected the applicant's conviction or sentencing.

The applicant's supplemental ground for relief should be denied.

---

[4]   *Ghahremani* also involved a *Brady* violation which was not addressed by the Court of Criminal Appeals.   See *Ex parte Gharemani*, 332 S.W.3d at 477.

16

WHEREFORE, PREMISES CONSIDERED, the State prays the Court find that the applicant's supplemental due process ground for relief is without merit.

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

DEBRA WINDSOR, Chief
Post-Conviction Unit

/s/ Steven W. Conder
STEVEN W. CONDER, Assistant
Criminal District Attorney
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672
State Bar No. 04656510

## CERTIFICATE OF SERVICE

A true copy of the above response has been mailed and electronically transmitted to the applicant's counsel, the Hon. Robert Udashen (rnu@sualaw.com), 2311 Cedar Springs Road, Suite 250, Dallas, Texas 75201, on this, the 15th of October, 2015.

/s/ Steven W. Conder
STEVEN W. CONDER

17

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 73.1(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 73.1(d) because it contains approximately 3253 words, excluding any exempted parts, as computed by Word 2010, the computer program used to prepare the document.

/s/ Steven W. Conder
STEVEN W. CONDER

c18.thompson timothy randal.wr/supplemental/reply