PD-1536-15

PD-1536-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/24/2015 12:54:53 PM
Accepted 11/24/2015 4:18:53 PM
ABEL ACOSTA
CLERK

# COURT OF CRIMINAL APPEALS

---

## PD-_____-15

---

## *Robert James Gray v. State of Texas*

---

**On Discretionary Review from
No. 05-14-00919-CR
Fifth Court of Appeals, Dallas**

**On Appeal From No. 062757
15th Judicial District Court, Grayson County**

---

# Motion to Extend Time to File
# Petition for Discretionary Review

**John Hunter Smith**
**707 W. Washington**
**Sherman, Texas 75092**
**Tel. (903)-893-8177**
**Fax (903)-892-0916**
**jsmith@wynnesmithlaw.com**
**Texas Bar No. 24028393**

**Kristin R. Brown**
**18208 Preston Road**
**Dallas, Texas 75252**
**Phone: 214-446-3909**
**Fax: 214-481-4868**
**kbrown@idefenddfw.com**
**Texas Bar No. 24081458**

FILED IN
COURT OF CRIMINAL APPEALS

November 24, 2015

ABEL ACOSTA, CLERK

**Attorneys for Appellant**

**To the Honorable Justices of the Court of Criminal Appeals:**

Appellant Robert James Gray moves for an extension of time of **30 days** to file a petition for discretionary review:

1. On November 18, 2015, in *Robert James Gray v. The State of Texas*, 05-14-00919-CR, 2015 Tex. App. LEXIS 11847 (Tex. App. Dallas, Nov. 18, 2015) (memorandum opinion), the Court of Appeals affirmed the trial court's judgment of conviction against Appellant. See attached.

2. The petition for discretionary review is due December 17, 2015.

3. For good cause, Appellant asks for an extension of 30 days, until **January 16, 2016**, to file the petition for discretionary review.

4. No previous extension to file the petition for discretionary review has been filed.

5. Appellant relies on the following facts as good cause for the requested extension: undersigned counsel Kristin R. Brown is currently working on a Brief on a Motion to Vacate Sentence under 28 U.S.C. § 2255 in *Ex Parte Michael Carroll* in 3:15-cv-03521-N, Northern District of Texas, currently due on November 30, 2015.

6. Further, Ms. Brown has the following briefs, petitions for discretionary review, or other pleadings due soon:

2

- Appellant's Original Brief in *David Wayne Cahill v. State of Texas*, 5th Court of Appeals, due December 4, 2015.

- Appellant's Original Brief in *Jorge Luis Ceja v. State of Texas*, 8th Court of Appeals, due December 7, 2015.

- Appellant's Reply Brief in *James Kirvin v. State of Texas*, 5th Court of Appeals, due December 3, 2015

- Appellant's Reply Brief in *Cathy Lea Bates v. State of Texas*, 5th Court of Appeals, due December 3, 2015.

- Appellant's Reply Brief in *James Duval v. State of Texas*, 7th Court of Appeals, due December 18, 2015.

7. In addition, Ms. Brown is preparing for oral arguments in *Henry Harrell v. The State of Texas*, 05-15-00133-CR, in front of the Fifth District Court of Appeals on December 8, 2015.

8. Finally, Ms. Brown will also be in trial December 9–10, 2015.

9. Attorney John Hunter Smith has the following briefs, petitions for discretionary review, or other pleadings due soon:

- Appellant's Reply Brief in *James Kirvin v. State of Texas*, 5th Court of Appeals, due December 3, 2015

- Appellant's Reply Brief in *Cathy Lea Bates v. State of Texas*, 5th Court of Appeals, due December 3, 2015.

10. In addition, Mr. Smith will be in trial in one of the following cases the week of December 7, 2015:

- Cause No. 063935; *State of Texas v. Marcus Aurelius Rasor,* 397th District Court, Grayson County, Texas;

3

- Cause No. 2013-1-1342; *State of Texas v. Kendall Jo Thompson*, County Court at Law # 1, Grayson County, Texas;

- Cause No. 2014-2-1262; *State of Texas v. Emily Rose Northern*, in County Court at Law #2, Grayson County.

11. This Motion is not filed for purposes of delay, but so that justice may be served.

## Prayer

Appellant prays that this motion for extension of time to file the PDR be granted.

Respectfully submitted,

The Law Office of Kristin R. Brown, PLLC
18208 Preston Road
Dallas, Texas 75252
Phone: 214-446-3909
Fax: 214-481-4868
kbrown@idefenddfw.com
Texas Bar No. 24081458
Attorney for Appellant

By: Kristin R. Brown

**Wynne & Smith**
707 W. Washington
Sherman, Texas 75092
Tel. (903)-893-8177

4

Fax (903)-892-0916
jsmith@wynnesmithlaw.com
Texas Bar No. 24028393

**/s/ John Hunter Smith**
By: John Hunter Smith

## Certificate of Service

I certify that on November 24, 2015, a true and correct copy of this document was served on Karla Baugh-Hackett of the Grayson County District Attorney's Office, Appellate Division, by email to baughk@co.grayson.tx.us and on Lisa McMinn, the State Prosecuting Attorney, by email to Lisa.McMinn@spa.texas.gov, and John Messinger, Assistant State Prosecuting Attorney, by email to john.messinger@spa.state.tx.us. *See* Tex. Rule App. Proc. 9.5 (2015) and 68.11 (2015).

By: Kristin R. Brown

# *Gray v. State*

Court of Appeals of Texas, Fifth District, Dallas

November 18, 2015, Opinion Filed

No. 05-14-00919-CR

**Reporter**

2015 Tex. App. LEXIS 11847

ROBERT JAMES GRAY, JR., Appellant v. THE STATE OF TEXAS, Appellee

**Notice:** PLEASE CONSULT THE TEXAS RULES OF APPELLATE PROCEDURE FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On Appeal from the 15th Judicial District Court, Grayson County, Texas. Trial Court Cause No. 062757.

## Core Terms

pillow, trial court, interview, injuries, causation, kid, jury charge, indictment, strips, seizure disorder, profile, blood, camouflage, omission, gagging, bruises, hogtied, murder, mouth, egregious, exhibits, sheet, pillowcases, breathing, cases, disabled individual, offenses, causing death, overrule, binding

## Case Summary

### Overview

HOLDINGS: [1]-The State presented sufficient evidence that defendant's actions caused the victim's death; [2]-The State did not use or elicit perjured evidence and did not mislead the jury by failing to discuss the two additional pillow cases nor did the State argue that there was only one pillow case; [2]-Defendant did not suffer egregious harm from the trial court's oral instruction regarding when an omission constituted an offense; [3]-Defendant did not suffer harm from the instruction on causation appearing in the abstract section but not in the application paragraphs; [4]-The amended indictment did not charge an additional or different offense; [5]-Evidence of extraneous offenses at the punishment phase of trial was properly admitted; [6]-The trial court properly admitted the three oral statements by defendant and his motion to suppress was properly denied.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > Credibility & Demeanor Determinations

*HN1* When an appellant challenges the sufficiency of the evidence to support a conviction, the appellate court reviews all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Evidence is sufficient if the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. If the evidence is conflicting, the appellate court presumes that the factfinder resolved the conflicts in favor of the prosecution' and defers to that determination.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

*HN2* A trial court's decision to admit or exclude evidence is viewed under an abuse of discretion standard. A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement.

Criminal Law & Procedure > ... > Obstruction of Administration of Justice > Perjury > Elements

*HN3* A person commits the offense of perjury if, with intent to deceive and with knowledge of the statement's meaning, he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath, *Tex. Penal Code Ann. § 37.02(a)* (2011). A conviction procured through the use of false testimony is a denial of due process guaranteed by the federal constitution. A due process

violation may arise not only through false testimony specifically elicited by the State but also by the State's failure to correct testimony it knows to be false. The knowing use of false testimony violates due process when there is a reasonable likelihood that the false testimony affected the outcome. Under the applicable standard, the applicant has the burden to provide by a preponderance of the evidence that the error contributed to his conviction or punishment.

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Jury Instructions

**HN4** When the appellate court claims of jury charge errors, it first decides whether there was error in the charge. If there was error and appellant objected to the error at trial, then only "some harm" is necessary to reverse the trial court's judgment. If, however, the appellant failed to object at trial—as in this case—then appellant will obtain a reversal only if the error is so egregious and created such harm that he has not had a fair and impartial trial—in short egregious harm. Egregious harm is the type and degree of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defense theory. In making an egregious harm determination, the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. Egregious harm is a difficult standard to meet and must be determined on a case-by-case basis.

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Jury Instructions

**HN5** The first Almanza factor requires consideration of the entire jury charge. The second Almanza factor involves the state of the evidence, including the contested issues and weight of the probative evidence. The third Almanza factor involves the argument of counsel. The final Almanza factor addresses any other relevant information revealed by the record of the trial as a whole.

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Elements of Offense

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Jury Instructions

**HN6** The function of a jury charge in a criminal trial is to instruct the jury on the law applicable to the case. The charge consists of an abstract portion and the application paragraphs. While the abstract portion serves as a glossary to help the jury understand the terms and concepts, the application paragraphs apply the law to the facts. Errors concerning the application paragraph are reviewed under *Tex. Code Crim. Proc. Ann. art. 36.19*, as applied in Almanza.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Conclusions of Law

Criminal Law & Procedure > ... > Indictments > Contents > Sufficiency of Contents

**HN7** When reviewing a trial court's decision to deny a motion to quash an indictment, the appellate court applies a de novo standard of review because the sufficiency of the indictment is a question of law. An indictment is sufficient when it charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, *Tex. Code Crim. Proc. Ann. art. 21.11* (2009).

Criminal Law & Procedure > ... > Indictments > Amendments & Variances > Authorized Amendments

**HN8** *Tex. Code Crim. Proc. Ann. art. 28.10(a)* (2006) provides that after notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. *Article 28.10* also provides that an indictment may not be amended over the defendant's objection as to form or substance if the amended indictment charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced.

Criminal Law & Procedure > ... > Indictments > Amendments & Variances > Authorized Amendments

**HN9** The Texas Court of Criminal Appeals has held that a different offense means a different statutory offense.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

**HN10** A trial court's decision to admit or exclude evidence is viewed under an abuse of discretion standard. A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement.

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

**HN11** *Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)* provides that evidence may be offered by the state and the

defendant as to any matter the court deems relevant to sentencing including, but not limited to, evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the appellant.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Motions to Suppress

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > Credibility & Demeanor Determinations

*HN12* The appellate court applies a bifurcated standard of review of a trial court's ruling on a motion to suppress by giving almost total deference to the trial court's determinations of fact and reviewing de novo the trial court's application of law.

**Judges:** Before Justices Lang, Evans, and Whitehill.

**Opinion by:** DAVID EVANS

# Opinion

## MEMORANDUM OPINION

Opinion by Justice Evans

Appellant Robert James Gray, Jr. appeals from the judgment adjudicating him guilty of murder. In six issues, appellant asserts that: (1) the evidence is legally insufficient to support the conviction; (2) he was denied due process of law when the trial court denied his motion to strike and overruled his objection to certain evidence; (3) the trial court improperly charged the jury; (4) the trial court improperly denied his motion to quash the State's amended indictment; (5) the trial court improperly allowed evidence of extraneous offenses for purposes of punishment enhancement; and (6) the trial court improperly denied his motion to suppress evidence. Deciding against appellant's arguments, we affirm the trial court's judgment.

## I. BACKGROUND

Holly White had three children—Brandon, Sabastian, and Carita. Brandon was diagnosed with attention deficit hyperactivity disorder (ADHD), bipolar disorder, mental retardation, and autism. In 2008, Brandon's head collided with Carita's head during a car [*2] accident. Carita died from her injuries and Brandon suffered a skull fracture which caused him to suffer from seizures. After the accident, Holly met appellant. In 2010, appellant, Holly, and her remaining children moved to Denison, Texas together. In October 2011, Holly, Brandon and Sabastian moved to California to be with appellant. All four of them moved back to Denison in November 2012 and lived with Holly's aunt for about a month before moving into their own home in Denison. During the evening of January 7 or morning of January 8, 2013, fifteen-year old Brandon was found unresponsive and not breathing. Appellant was indicted for the murder of Brandon and pleaded not guilty. A trial then commenced with over twenty-five witnesses testifying for the prosecution and defense.

### A. Paramedic and Police Testimony

Juan Ortiz and Damon Morris, firefighters/paramedics with the Denison Fire Department, responded to a 911 call reporting a fifteen-year old who was not breathing. When Ortiz and Morris arrived, appellant was walking out the door and told them "he's breathing." Ortiz testified that he walked in the front door to see a fifteen-year old male lying lifeless on the floor and Holly sitting [*3] in a chair. Morris testified he saw a person laying on his back on the floor with his shirt lifted up, bruises all over and mouth all bruised up. After finding no pulse, Ortiz examined Brandon and noticed his face had heavy bruising, ligature marks on his wrist, and rigor mortis had set in. Ortiz also testified that Brandon had blood coming from his mouth, a black eye, and multiple bruises on the face. Morris testified that Brandon's body was cold and he reiterated that rigor mortis had set in. Ortiz told his captain to notify the police because he suspected foul play due to the amount of trauma on the body. Ortiz asked appellant what happened and appellant stated that Brandon was involved in an altercation with his younger sibling. Ortiz further testified that because it takes two to three hours for rigor mortis to set in, it was not possible for Brandon to have been breathing when Ortiz arrived at the scene.

Isaac Bates, a Denison police officer, responded to the crime scene at the request of the Denison EMS. Officer Bates testified that appellant told him that Brandon's facial injuries were caused by falling off the air mattress onto the floor because of a seizure. Officer Bates [*4] did not find this to be plausible because the mattress would have held Brandon only six to eight inches off the floor. Officer Bates testified that Brandon looked like he had been involved in an assault because of the facial injuries and that he had cigarette burns on his hands. When Officer Bates asked again what had caused Brandon's facial injuries, appellant then stated that Brandon had fallen and hit his face on the bar in the kitchen. Officer Bates also testified that he saw appellant smoking.

Sergeant Bill Hayth, a sergeant in the criminal investigation division of the Denison police department, assisted with the crime scene. He noticed that appellant's knuckles on his hand were swollen, and his hand was subsequently photographed. Sergeant Hayth testified that he witnessed the following markings on Brandon's body: (1) laceration in the corner of his mouth; (2) blood on his mouth; (3) swollen lips; (4) contusion above his right eye; (5) raw skin on both shoulders; (6) lacerations on his wrists; (7) bruising on the legs and ankles; and (8) other bruises and lacerations.

John Watt, a detective in the Denison police department, also reported to the crime scene. Appellant informed Detective [*5] Watt that Brandon had been aggressive and having seizures and that he was staying with Brandon while the mother slept. Appellant also informed Detective Watt that he found Brandon dead. Detective Watt testified that Brandon's bedding, pillow, pillowcases, and white fabric strips were collected, preserved, and sent to the lab.

Kyle Mackay, a detective in the Denison police department, testified about two interviews he conducted with appellant—one at 6:00 a.m. on January 8, 2013, and one after appellant's arrest on January 9, 2013. On January 8, 2013, appellant told Detective Mackay that Brandon was getting worse from lack of medication and that they had to tie him up. During the interview, appellant admitted to hogtying and gagging Brandon over the two days leading up to his death and even on the date of death. Appellant denied, however, that Brandon had been bound at the time of his death. Appellant did admit that he was the last one to see Brandon alive. Detective Mackay testified that he was trained—in both the military and as a police officer—to never put anyone in the hogtie position because the person is not able to breath properly and could die. Detective Mackay also observed [*6] that appellant's knuckle on his right hand was swollen from what appeared to be offensive wounds from hitting something. Detective Mackay noted that appellant did not have any injuries on his face, head, chest, neck, shoulders, stomach, chin or back despite his allegation that he had to defend himself from a violent child. Appellant also admitted to Detective Mackay that he restrained Brandon in the middle of the night when Holly was not present.

Detective Mackay also interviewed appellant after his arrest on January 9, 2013, and noted that appellant's knuckle appeared more swollen and a bruise had begun to form. Detective Mackay testified that appellant had a wound on his left thumb and bruising across his forearm and up to his biceps. Appellant told Detective Mackay that he got these injuries when he was tying up Brandon. In regard to the swelling on his right hand, appellant told Detective Mackay that the injury had resulted from different causes during the interview—moving a ceiling fan, doing car work, or a preexisting injury. Appellant also admitted to gagging Brandon when he yelled and screamed. Detective Mackay noted that appellant kept contradicting and changing his story. [*7] Both interviews were played for the jury and entered into evidence.

## B. Medical Evidence

On Brandon's first day of school in 2010, he was angry, cursing, hitting, and biting. In October 2010, the Denison Independent School District referred Brandon to Dr. Vernon Johnson, a child and adolescent psychiatrist, for a psychiatric evaluation. The school and Dr. Johnson agreed that Brandon would receive homebound studies and Dr. Johnson prescribed medication for Brandon's agitation. At trial, Dr. Johnson testified that he concurred with the diagnosis of the autistic disorder as well as some of the symptoms of the ADHD and bipolar and that the diagnosis of mental retardation was justified from the prior testing. At the time of Brandon's death, Dr. Johnson testified that Brandon was functioning at the level of a three or four-year old. He further testified that children with these illnesses often suffer from severe anxiety symptoms and respond to fear with exaggerated behavior and that placing a child with these symptoms in restraints would exacerbate their condition. Dr. Johnson further noted that putting a child who suffers from seizures in a hogtied position and gagging him would put tremendous [*8] stress on his body. Dr. Johnson also testified that Brandon met the criteria for the legal definition of a disabled person.

Dr. Joni McClain, the medical examiner, testified about Brandon's autopsy and his cause of death. Dr. McClain testified that Brandon was five feet tall, weighed ninety-eight pounds, and was severely dehydrated. Dr. McClain concluded that Brandon had suffered pre-mortem injuries including evidence of ligature marks on his wrists and ankles, gag markings, injuries inside the mouth, and injuries all over the body. Dr. McClain testified that positional asphyxiation is when you get in a position that makes it difficult to breathe and could result from being hogtied and gagged. Dr. McClain testified that the following evidence was indicative of positional asphyxiation and ligature bindings: (1) pattern of abrasion of wrists and ankles; (2) brush burn abrasions ("carpet burn") on Brandon's front body and face which is indicative of struggling; (3) recent hemorrhage of the cheeks (from binding); (4) recent injury to the lips (from binding); and (5) petechial hemorrhages of the eye (blood vessels bursting around the eyes when the

body is not getting enough air). Brandon [*9] also had three blunt force injuries on his head which Dr. McClain testified could not have happened in a single fall but likely occurred around the same time. Brandon also had injuries to his ear, nose, chest, hip, back, ribs, buttocks, as well as injuries on his fingers consistent with a cigarette burn. Brandon's toxicology report detected the presence of antiseizure medication. Dr. McClain concluded that Brandon's cause of death was homicidal violence including positional asphyxia and ligature binding.

## C. DNA Evidence

Uyen Henson, a quality assurance specialist for the Texas Department of Public Safety Crime Laboratory, testified about the evidence she analyzed in this case. Henson tested nine stains on a floral twin fitted sheet from the couch that were positive for blood, and was able to obtain one DNA profile (unknown male one) from a stain on top of the sheet. Henson also tested a camouflage-colored sheet from the couch and four stains on this sheet tested positive for blood. Henson determined the blood stains on both sheets contained the same DNA profile (unknown male one). Henson also tested the three fabric strips found on the kitchen table. Henson tested the strips for blood [*10] and DNA. In addition, Henson swabbed the edges of the strips for "hand delivered DNA" which would identify "whoever would have possibly held the strips or tied the strips." Each of the strips had areas that tested positive for blood and the DNA analysis confirmed the blood had the same profile as the sheets. When the edge of the first strip, exhibit 67A, was swabbed, Henson identified the same DNA profile as found on the sheets as well as one as well as another DNA profile (unknown male two). Henson swabbed the second and third strips, exhibits 67B and 67C, and a fourth strip, exhibit 81, again identified the same two DNA profiles. Henson tested the blood stains on exhibit 71A, a half sheet from the parent's closet, and the DNA profile of a stain was consistent with unknown male one. Finally, Henson also examined exhibits 64A and 64B, the purple pillow and camouflage pillow case, for DNA evidence. The pillow was covered by three pillow cases, the camouflage pillow case being the one on the outside. Henson tested three stains on the camouflage pillow case and two were positive for blood.

Gloria Ruiz, a forensic scientist in the DNA section of the Texas Department of Public Safety Crime [*11] Laboratory, also analyzed the DNA evidence in this case. Ruiz analyzed a saliva specimen from appellant and blood and hair specimens from Brandon. Ruiz also analyzed the DNA from the camouflage pillow case and the DNA profile was consistent with a mixture of DNA from appellant and Brandon. Ruiz concluded Brandon's DNA profile matched unknown male one and appellant's DNA profile matched unknown male two. Therefore, Ruiz confirmed that Brandon's DNA was found on the blood stains from the floral twin fitted sheet, the camouflage sheet, and the white fabric strips. The swabbing of these strips identified the DNA profiles of Brandon and appellant.

## D. Other Testimony

Rafael Murguia, an inmate serving a prison sentence in the federal penitentiary, testified about conversations he had with appellant when they served time together. Murguia testified that appellant told him that he moved in with a lady and two kids and one of the kids was sick. Murguia further testified that appellant told him that the lady quit giving the sick kid his medicine so the kid was kicking, screaming and trying to bite everyone. Appellant then said he tied the kid up and the kid kept screaming so he got a cushion to [*12] quiet him up. When the kid got quiet, appellant went to sleep. Murguia testified that appellant told him that when appellant got up to check on the kid the next day that the kid was cold and not moving and he called the paramedics. Murguia testified that, although he did not receive a plea deal for his testimony, he came forward because it was the right thing to do and appellant showed no remorse.

Leann Williams, Holly's aunt, testified that appellant, Holly, and Holly's sons had lived with her on two separate occasions. Holly, appellant and the kids moved back to Denison in late October 2012 and lived with Williams for about a month. Williams stated that Brandon was not a dangerous child and not large for his age as he was only about one hundred pounds. Williams testified that Brandon's seizures were mild and not violent. In late December 2012, Williams testified that Holly and appellant were arguing over whether Brandon should be placed in a facility—Holly wanted to keep Brandon home and appellant wanted him placed in a facility.

Holly testified that she, appellant and her children moved back to Texas on November 1, 2012. Holly stated that she refilled Brandon's prescriptions right [*13] before they left California and that the medications should have lasted anywhere from thirty-five to forty-three days. Holly testified that she did not go to the Texas Medicaid office during the time period of November 1, 2012 through January 7, 2013—a time period of approximately sixty-nine days. Accordingly, at the time of his death, Holly testified that Brandon had been withdrawing off his medications for a week or two. Holly testified that she did apply for Brandon to receive Texas Medicaid on January 7, 2013. Holly

testified that between 12 a.m. and 12:30 a.m. in the morning of January 8, 2013, she woke up appellant and asked him to come sit with Brandon because Brandon did not want to sleep. Holly admitted to helping appellant tie up Brandon and that she had lied to the police when she told them that appellant had never hogtied Brandon. Holly also admitted that in January 2013 her relationship with appellant was "getting rockier" over Brandon because appellant wanted to place him in a home. She stated that two or three days before Brandon died, they started hogtying Brandon. Holly also testified that she left Brandon with appellant on January 7, 2013, and when she returned she [*14] noticed that Brandon had injuries including a knot on his head, and marks on his lips, above his eye, and on his wrist. She stated that appellant told her that Brandon had a seizure and fell and hit the bar between the dining room and kitchen. Holly testified that on the night of Brandon's death, Brandon would not calm down and was screaming. She confirmed that although they had run out of Brandon's behavioral medication, he still had his antiseizure medication on the day of his death. Holly testified that appellant woke her up and said "I think something is wrong with Brandon."

### E. Judgment and Punishment

The jury found appellant guilty of murder as alleged in the indictment. Following the punishment hearing, appellant was sentenced to ninety years' imprisonment. Appellant then filed this appeal.

## II. ANALYSIS

### A. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE CONVICTION

#### 1. INDICTMENT

The amended indictment alleged the charge of felony murder as follows:

> Robert James Gray, Jr., hereinafter called "Defendant," did then and there commit or attempt to commit an act clearly dangerous to human life, to-wit: by tying up Brandon White, by gagging Brandon White, by placing Brandon White in what is commonly [*15] referred to as a hogtied position or similar position, by leaving Brandon White unattended while tied-up, by striking Brandon White, by causing blunt force trauma to Brandon White, by impeding Brandon White's normal breathing by applying pressure to the victim's neck or by blocking the victim's nose or mouth, or by any combination of the preceding, that caused the death of Brandon White and the defendant was then and there in

the course of committing a felony, to-wit: Aggravated Assault, Injury to a Disabled Individual, or Unlawful Restraint, and said death of Brandon White was caused while the defendant was in the course of and in furtherance of or immediate flight from the commission or attempt of said felony.

#### 2. Standard of review

Appellant contends the evidence is insufficient to support a finding of guilt for the offense of felony murder. *HN1* When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012)*. Evidence is sufficient if "the inferences necessary to establish [*16] guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id.* If the evidence is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *Id.* (quoting *Jackson v. Virginia, 443 U.S. 307, 326, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979))*.

#### 3. Analysis

Appellant argues that the State failed to present sufficient evidence at trial that appellant's actions caused Brandon's death. We disagree.

Ortiz, a paramedic, testified that when he arrived upon the scene that Brandon was dead and that rigor mortis had set in. He also told his captain to notify the police because he suspected foul play due to the amount of trauma on the body. Both he and his fellow paramedic/firefighter, Morris, testified that Brandon's body was heavily bruised. Ortiz specifically testified that Brandon had blood coming from his mouth, a black eye, and multiple bruises on the face, and Morris noted that Brandon had ligature marks on his wrists. Sergeant Hayth testified that he witnessed the following markings on Brandon's body: (1) laceration in the corner of his mouth; (2) blood on his mouth; (3) swollen lips; (4) contusion above his right eye; (5) raw skin [*17] on both shoulders; (6) lacerations on his wrists; (7) bruising on the legs and ankles; and (8) other bruises and lacerations. Appellant gave the police and paramedics various and inconsistent explanations for Brandon's heavy bruising and injuries including: (1) Brandon had an altercation with his brother; (2) Brandon fell off the air mattress and onto the floor because of a seizure; or (3) Brandon had fallen and hit

his face on the bar in the kitchen. Both Sergeant Hayth and Detective Mackay testified that appellant had swollen knuckles. Detective Mackay testified that appellant's injuries appeared to be offensive wounds from hitting something. When Detective Mackay asked about the cause of his swollen knuckles, appellant again gave inconsistent explanations during his interview.

Brandon's mother, Holly, testified that on the night of Brandon's death, Brandon would not calm down and was screaming. She further testified that she woke up appellant and asked him to come sit with Brandon. Appellant admitted in his interviews that he was the last person to see Brandon alive. Appellant told Detective Hayth that Brandon had been aggressive the night of his death. Detective Mackay testified, [*18] however, that appellant did not have any injuries on his face, head, chest, neck, shoulders, stomach, chin or back despite his allegation that he had to defend himself from a violent child. Appellant also admitted to restraining Brandon in the middle of the night on January 8, 2013, when Holly was not present. Holly admitted that she and appellant began tying up Brandon in the hogtied position a few days before his death. Appellant also admitted to hogtying and gagging Brandon over the two days leading up to his death as well as on the date of death.

Dr. McClain, the medical examiner, testified that Brandon had suffered pre-mortem injuries including evidence of ligature marks on his wrists and ankles, gag markings, injuries inside the mouth, and injuries all over the body. Dr. McClain testified that positional asphyxiation is when you get in a position that makes it difficult to breathe and could result from being hogtied and gagged. Dr. McClain testified that the following evidence was indicative of positional asphyxiation and ligature bindings: (1) pattern of abrasion of wrists and ankles; (2) brush burn abrasions ("carpet burn") on Brandon's front body and face which is indicative [*19] of struggling; (3) recent hemorrhage of the cheeks (from binding); (4) recent injury to the lips (from binding); and (5) petechial hemorrhages of the eye (blood vessels bursting around the eyes when the body is not getting enough air). Brandon also had three blunt force injuries on his head which Dr. McClain testified could not have happened in a single fall but likely occurred around the same time. Brandon also had injuries to his ear, nose, chest, hip, back, ribs, buttocks, as well as injuries on his fingers consistent with a cigarette burn. Dr. McClain concluded that Brandon's cause of death was homicidal violence including positional asphyxia and ligature binding.

The police recovered the following items for DNA testing: (1) sheets from the couch where Brandon was sleeping; (2) fabric strips used for gagging; and (3) the camouflage pillow case. The DNA tests confirmed that the blood stains on the sheets matched Brandon's DNA profile. The blood stains on the camouflage pillow case had a DNA profile consistent with a mixture of DNA from appellant and Brandon. In addition, the blood stains on the fabric strips were tested and the DNA analysis confirmed the blood matched Brandon's DNA [*20] profile. The fabric strips were also swabbed for "hand delivered DNA" which would identify "whoever would have possibly held the strips or tied the strips." The swabbing located the presence of two DNA profiles—Brandon and appellant.

In addition, Murguia, an inmate serving a prison sentence in the federal penitentiary, testified about conversations he had with appellant when they served time together. Murguia testified that appellant told him that he moved in with a lady and two kids and one of the kids was sick. Murguia further testified that appellant told him that the lady quit giving the sick kid his medicine so the kid was kicking, screaming and trying to bite everyone. Appellant then said he tied the kid up and the kid kept screaming so he got a cushion to quiet him up. When the kid got quiet, appellant went to sleep. Murguia testified that appellant told him that when appellant got up to check on the kid the next day that the kid was cold and not moving and he called the paramedics.

When considered in the light most favorable to the verdict, the facts in this case were sufficient to support a conviction for murder as alleged in the indictment—that one or more actions by the appellant, [*21] namely by tying up Brandon, by gagging Brandon, by placing Brandon in what is commonly referred to as a hogtied position, by striking Brandon, by causing blunt force trauma to Brandon, by impeding Brandon's normal breathing by applying pressure to the victim's neck or by blocking the victim's nose or mouth, or by any combination of the proceeding, caused Brandon's death. We overrule appellant's first issue.

## B. The Motion to Strike Was Properly Denied

Appellant asserts that the State committed prosecutorial misconduct by actively eliciting perjured testimony from Detective Watt regarding evidence seized from the scene of Brandon's murder and that the evidence introduced by Detective Watt should have been stricken.

### 1. Additional facts

During trial, the State called Detective Watt who testified that he collected a pillow with a camouflage pillow case and initially placed the pillow into a trash bag because he did not

have an evidence bag large enough to contain it. The pillow was later transferred to a paper sack so it would dry. Detective Watt specifically testified that he did not remove the pillow case from the pillow but collected it as it was, preserved it and sent it off to the lab. [*22] The State moved to admit Exhibits 64A (pillow), 64B (camouflage pillowcase), and 64 (bag). Appellant's counsel objected and asked to take the witness on voir dire. Counsel asked Detective Watt about the presence of additional pillow cases on the pillow. Detective Watt replied that he sent the pillow in its original state to the lab and did not pull it apart or check to see how many pillow cases were on the pillow. Counsel withdrew his objection and the court admitted the three exhibits.

During appellant's cross-examination of Detective Watt, counsel again asked him about the additional pillow cases:

> Appellant's counsel: You didn't know what was underneath that camouflage pillowcase?
>
> Detective Watt: No.
>
> Appellant's counsel: According to this -- according to the crime lab, there was two other pillowcases on that pillow, correct?
>
> Detective Watt: You would have to ask them.
>
> Appellant's counsel: Okay. But when you collected these items, Item Number 3, they weren't separated, were they?
>
> Detective Watt: No, I did not separate them.
>
> Appellant's counsel: Okay. But here today you have separated these items before this jury, correct?
>
> Detective Watt: The camo one is there, and other ones are in the box. [*23]
>
> Appellant's counsel: Right. But that's not how it was collected?
>
> Detective Watt: No.

Appellant's counsel: Your Honor, we would move to strike State's Exhibit 64A and 64B. It is not a true and correct . . . we would ask that this item be removed from evidence. They have failed to provide all -- a clear chain of what this exhibit is. He's acknowledged this is where it is. We would ask that it would be removed at this time. If they can further follow it up with the DNA analyst. But there has been -- this document -- this item is not correct as how it was discovered and that's even

according to the DPS crime lab, there was three pillowcases.

State: Your Honor it's already been admitted, the predicate laid. He collected the pillow that was inside multiple pillowcases. The camo pillow was on the outside. It was the only one with relevant DNA evidence on it. It's on the outside. So we just didn't admit the other two pillowcases that were found. The DNA people are going to testify that they pulled those out one by one. So, Mr. Smith, you know if he had objections to this, the time to voice them was when we entered the exhibits. It's already been admitted and the predicate laid.

Appellant's counsel: [*24] Your Honor -- Your Honor, I did admit my objection at that time. I did say three pillowcases. This witness, who is the sponsoring witness, indicated there wasn't [sic] any other pillowcases. He's the case agent. We do now know there was [sic] two others. This was a deliberate attempt to mislead the jury.

State: Absolutely not, Your Honor. All three of us met at the Denison Police Department and went over this.

Appellant's counsel: I object.

Court: Counsel, this goes to weight, not admissibility. I'll overrule the objection.

**2. Standard of review**

*HN2* A trial court's decision to admit or exclude evidence is viewed under an abuse of discretion standard. *Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002)*. A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Green v. State, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996)*.

**3. Analysis**

Appellant argues that the State engaged in willful misconduct by making a conscious effort to deceive the court and the jury by presenting "half-truths" regarding the pillow and the pillowcases. Specifically, appellant argues that the State deliberately misled the court and jury by introducing exhibits 64A and 64B as if those two made the whole of exhibit 64, even though the two additional pillow cases were not mentioned, and that [*25] it did so through perjured testimony. We disagree.

*HN3* A person commits the offense of perjury if, with intent to deceive and with knowledge of the statement's meaning,

he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath. *See* *TEX. PENAL CODE ANN. § 37.02(a)* (West 2011). A conviction procured through the use of false testimony is a denial of due process guaranteed by the federal constitution. *See* *Ex parte Ghahremani, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011).* A due process violation may arise not only through false testimony specifically elicited by the State but also by the State's failure to correct testimony it knows to be false. *Id.* The knowing use of false testimony violates due process when there is a reasonable likelihood that the false testimony affected the outcome. *Id. at 478.* Under the applicable standard, the applicant has the burden to provide by a preponderance of the evidence that the error contributed to his conviction or punishment. *See* *Ex parte Chabot, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009).*[1]

Here, appellant has numerous obstacles to overcome. First, the State did not use or elicit perjured evidence. Detective Watt repeatedly testified that when he collected the pillow for evidence, the camouflage pillowcase was on the outside of the pillow. He also consistently stated that he was unaware if additional pillow cases existed beneath the camouflage pillow case. Further, when appellant specifically asked Detective Watt about the two additional pillow cases, he told appellant's counsel that he would have to ask the crime lab about any additional pillow cases. Appellant fails to cite any evidence indicating that Detective Watt knew about the additional pillow cases or testified inaccurately. Second, the State did not mislead the jury by failing to discuss the two additional pillow cases nor did the State argue that there was only one pillow case. Instead, the State concentrated on the camouflage pillow case because it was "the only one with relevant DNA evidence on it." At trial, the State argued that appellant and Brandon's blood was on the camouflage pillow case and this was consistent with the State's theory that appellant smothered Brandon's [*27] bloody face with the pillow. Finally, there is no evidence that this alleged "error" contributed in any way to appellant's conviction.

For the reasons discussed above, the trial court did not abuse its discretion in denying appellant's motion to strike and overruling appellant's objections to the admission of evidence. We overrule appellant's second issue.

## C. The Jury Charge Was Proper

Appellant asserts that the trial court committed reversible error by reading language on omission and by not including other language regarding causation. We disagree.

### 1. Additional facts

Following the conclusion of the trial, the trial court conferred with counsel regarding the jury charge. Appellant objected to the trial court's wording of the instruction on causation and requested that the following language be included:

> As it relates to causation we would object to the Court's Charge and we specifically request the following charge which is contained on page five of our proposed charge and throughout. But I would read into the record we respectfully request the Court the State has the burden of proving that the defendant caused the death of Brandon White, to prove that the defendant caused the death of [*28] Brandon White. The State must show beyond a reasonable doubt one of the following. One, a seizure disorder did not contribute to the death of Brandon White or, two, a seizure disorder was clearly insufficient by itself to cause the death of Brandon White. Or three, the conduct of the defendant was clearly sufficient to cause the death of Brandon White regardless of the seizure disorder. If you all agree the State has failed to prove beyond a reasonable doubt one or more of the elements of one, two and three above, we will next consider. It goes on for each one of each of the offenses in this case.

Appellant argued that the instruction for causation should be individually applied to the facts in each application paragraph. The trial court overruled appellant's objections to the charge regarding causation. Although the trial court did include an instruction on causation in the jury charge, it did not include the causation instruction in each of the application paragraphs. The instruction read as follows:

> A person is criminally responsible if the result (Brandon's death) would not have occurred but for his conduct, operating either alone or concurrently with another cause (seizure disorder), [*29] unless the concurrent cause (seizure disorder) was clearly sufficient to produce the result (Brandon's death) and the conduct of the actor clearly insufficient.

Appellant's counsel also objected to the phrase "by act or omission" in the jury charge as it related to injury to a

---

[1]  The court in *Chabot* also recognized that an unknowing use of perjured testimony could create a due process claim. Because there is no evidence of any false testimony in this case, however, we do not reach the issue of whether [*26] the State had intent to deceive.

disabled individual. The court agreed to omit this language from the jury charge and the phrase "by act or omission" did not appear in print in the final jury charge. However, the trial court read the following paragraph on omission aloud to the jury:

> An omission that causes serious bodily injury, serious mental deficiency, impairment or injury or bodily injury to a disabled individual is conduct constituting an offense if the actor has a legal duty to act or the actor has assumed care, custody or control of the disabled individual.

Appellant's counsel did not make an objection after the court read this statement or after the court completed its reading of the whole jury charge.

**2. Standard of review**

HN4 When we review claims of jury charge errors, we first decide whether there was error in the charge. *Ferguson v. State, 335 S.W.3d 676, 684 (Tex. App.—Houston [14th Dist.] 2011, no pet.).* If there was error and appellant objected to the error at trial, then only "some harm" is necessary to reverse the [*30] trial court's judgment. *See Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)* (op. on reh'g). If, however, the appellant failed to object at trial—as in this case—then appellant will obtain a reversal "only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Id.* Egregious harm is the type and degree of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defense theory. *Allen v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).* In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information [revealed] by the record of the trial as a whole." *Trejo v. State, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009)* (quoting *Almanza, 686 S.W.2d at 171*). Egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *See Ellison v. State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002).*

**3. Analysis**

**(a) Omission**

Appellant first argues that the trial court committed reversible error when it read aloud language on omission as it relates

to injury to a disabled individual. The written charge, however, clearly removed any mention of the phrase "by act or omission" as it related to injury to [*31] a disabled individual. Here, appellant did not make an objection after the trial court read the charge and, therefore, appellant must show that such error amounted to egregious harm. *Almanza, 686 S.W.2d at 171*. With these principles in mind, we will proceed to conduct a harm analysis using the *Almanza* factors. *See Dougherty v. State, 188 S.W.3d 670, 2006 WL 475802, at *1 (Tex. Crim. App. 2006)* (per curiam) (not designated for publication) (reversing appellate court that did not conduct analysis using all *Almanza* factors).

HN5 The first *Almanza* factor requires consideration of the entire jury charge. *See Almanza, 686 S.W.2d at 171*. Here, as stated above, the jury charge removed any mention of the phrase "by act or omission" as it related to injury to a disabled individual. Accordingly, the charge as a whole does not weigh in favor of egregious harm. *See Medina v. State, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999).*

The second *Almanza* factor involves the state of the evidence, including the contested issues and weight of the probative evidence. *See Almanza, 686 S.W.2d at 171*. As analyzed above in appellant's first issue, we have already determined that the facts were sufficient for the jury to have convicted appellant of murder. As such, the state of the evidence does not favor a finding of egregious harm.

The third *Almanza* factor involves the argument of counsel. *See Almanza, 686 S.W.2d at 171*. In [*32] the State's closing argument, we are unable to find any reference to how an omission constitutes an offense. Instead, the State discussed how the actions of appellant caused Brandon's death. The argument of counsel does not favor a finding of egregious harm.

The final *Almanza* factor addresses any other relevant information revealed by the record of the trial as a whole. *See Almanza, 686 S.W.2d at 171*. We have not found and appellant has not pointed to any utterance before the jury at any stage of the trial about any omission by appellant causing Brandon's death other than the trial court's reading an instruction about omission when it read the charge of the court. We are not aware of "any other relevant information" that we should consider. The final *Almanza* factor does not favor a finding of egregious harm.

Thus, in light of the *Almanza* factors, we are unable to conclude that appellant suffered egregious harm from the trial court's oral instruction regarding when an omission constitutes an offense. Accordingly, we overrule the part of appellant's third issue regarding the "omission" language.

**(b) Causation**

Appellant next argues that the trial court erred by failing to include his application paragraph on causation [*33] because he did not receive the benefit of the instruction as required by *section 6.04 of the Texas Penal Code*. We disagree.

*HN6* The function of a jury charge in a criminal trial is to instruct the jury on the law applicable to the case. *See Dinkins v. State, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)*. The charge consists of an abstract portion and the application paragraphs. *See Degrate v. State, 86 S.W.3d 751, 752 (Tex. App.—Waco 2002, pet ref'd.)*. While the abstract portion serves as a glossary to help the jury understand the terms and concepts, the application paragraphs apply the law to the facts. *Id.* Errors concerning the application paragraph are reviewed under article 36.19, as applied in *Almanza. Id. at 753*.

Here, the abstract portion of the jury charge contained a correct instruction on causation according to *section 6.04 of the Texas penal code* and it applied the facts to the case:

> A person is criminally responsible if the result (Brandon's death) would not have occurred but for his conduct, operating either alone or concurrently with another cause (seizure disorder), unless the concurrent cause (seizure disorder) was clearly sufficient to produce the result (Brandon's death) and the conduct of the actor clearly insufficient.

The application paragraphs of the jury charge, however, made no reference to appellant's theory that Brandon's seizure disorder caused his death. To the extent that this constitutes "error" [*34] in the charge, we proceed with a determination of whether sufficient harm resulted from this alleged error to require reversal. *See Almanza, 686 S.W.2d at 171.*[2]

The first *Almanza* factor requires consideration of the entire jury charge. *See Almanza, 686 S.W.2d at 171*. Here, as stated above, the jury charge included an instruction on causation which applied the facts of the case and tracked the language of *section 6.04*. Further, this instruction appeared directly before all of the application paragraphs. Accordingly, the charge as a whole does not weigh in favor of some harm. *See Medina, 7 S.W.3d at 640*.

The second *Almanza* factor involves the state of the evidence, including the contested issues and weight of the probative evidence. *See Almanza, 686 S.W.2d at 171*. In order for the jury to believe appellant's theory, they would have [*35] had to believe that Brandon's seizure disorder alone was clearly sufficient to produce his death and the conduct of appellant was clearly insufficient. The evidence, as analyzed above in appellant's first issue, did not support this conclusion. As such, the state of the evidence does not favor a finding of some harm.

The third *Almanza* factor involves the argument of counsel. *See Almanza, 686 S.W.2d at 171*. Here, the State specifically discussed the causation paragraph in the jury charge during its closing argument:

> Now you have a causation paragraph in the jury charge. And there is some language here about operating alone or concurrently with another cause.

> But if you believe that Brandon had a seizure disorder which either caused his death or contributed to his death to find the defendant not guilty, you have to do two things. You have to find that the concurrent -- that the seizure disorder was clearly sufficient to cause the death and you have to find that the defendant's conduct, i.e. binding him, gagging him, doing all of those things were clearly insufficient.

> The evidence shows that Brandon died from these acts clearly dangerous to human life but if you will say that seizure disorder contributed, you have [*36] to find that those things were not sufficient and that the seizure disorder was clearly sufficient. So you have to do those two things.

Thus, the State applied the abstract instruction on causation to the facts in its closing argument to the jury. Similarly, appellant's counsel explained the causation instruction to the jury in his closing argument:

> Third, if you find that he committed an act clearly dangerous to human life and that was in the scope of you still have to find beyond a reasonable doubt that that act caused the death of Brandon White. So what does that mean? Well, it means that he caused it. It also means and the State has to prove to you that the seizure disorder or one of the other medical disorders or mental

---

[2]   The State argues that appellant failed to preserve this issue on appeal because appellant did not specifically object that the trial court failed to apply the instructions for causation to the facts in this case or that the causation language should be charged in each application paragraph. However, as appellant did raise an objection to the court's causation instruction in the trial court below, we will apply the "some harm" standard and not the "egregious harm" standard.

disorders that Brandon suffered from was insufficient by itself to cause Brandon's death. Insufficient.

You have to find that or you have to find that Robert's conduct was sufficient to cause Brandon's death even with those things. If the State can't prove one of those two things, Robert can't be found guilty of murder. Certainly not if they have to show you. They have to prove to you beyond all reasonable doubt.

Therefore, appellant's counsel reiterated that appellant [*37] could only be found guilty if the State proved that Brandon's seizure disorder was insufficient to cause Brandon's death and appellant's conduct was sufficient to cause Brandon's death. Thus, the argument of counsel does not favor a finding of some harm.

The final *Almanza* factor addresses any other relevant information revealed by the record of the trial as a whole. *See Almanza, 686 S.W.2d at 171.* We are not aware of "any other relevant information" that we should consider.

Thus, in light of the *Almanza* factors, we are unable to conclude that appellant suffered any harm from the trial court's instruction on causation appearing in the abstract section but not in the application paragraphs. Accordingly, we overrule the part of appellant's third issue regarding the "causation" language.

### D. The Motion to Quash Was Properly Denied

Appellant asserts that the trial court committed reversible error when it denied his motion to quash the State's amended indictment because appellant was prejudiced by the changes to the indictments.

### 1. Additional facts

The original indictment was filed with the trial court on March 6, 2013, and included seven counts: (1) murder; (2) aggravated assault causing serious bodily injury with a deadly [*38] weapon-family violence; (3) manslaughter; (4) aggravated assault causing serious bodily injury; (5) injury to a disabled individual; (6) unlawful restraint; and (7) unlawful restraint of an individual under the age of seventeen. Count one of the indictment alleged as follows:

commit or attempt to commit, an act clearly dangerous to human life, to-wit: by tying him up, by gagging him,

by placing him in what is commonly referred to as a hogtied position or similar position, by leaving him unattended while tied-up, or by any combination of the preceding, that caused the death of Brandon White and the defendant was then and there in the course of committing a felony, to-wit: Aggravated Assault, Injury to a Disabled Individual, or Unlawful Restraint, and said death of Brandon White was caused while the defendant was in in the course of and in furtherance of or immediate flight from the commission or attempt of said felony.

On January 2, 2014, appellant filed a motion to quash the indictment which alleged, among other things, that the indictment lacked specificity and failed to provide appellant with sufficient notice. On May 14, 2014, the State filed a motion to amend the indictment. The [*39] State requested that it be allowed to change the pronoun "him" in count one to "Brandon White" and by adding additional manner and means language. The new language proposed by the State in count one is indicated with italics:

commit or attempt to commit an act clearly dangerous to human life, to-wit: by tying up *Brandon White*, by gagging *Brandon White*, by placing *Brandon White* in what is commonly referred to as a hogtied position or similar position, by leaving *Brandon White* unattended while tied-up, *by striking Brandon White, by causing blunt force trauma to Brandon White, by impeding Brandon White's normal breathing by applying pressure to the victim's neck or by blocking the victim's nose or mouth*, or by any combination of the preceding, that caused the death of Brandon White and the defendant was then and there in the course of committing a felony, to-wit: Aggravated Assault, Injury to a Disabled Individual, or Unlawful Restraint, and said death of Brandon White was caused while the defendant was in the course of and in furtherance of or immediate flight from the commission or attempt of said felony.[3]

On May 14, 2014, the trial court granted the State's motion to amend and denied [*40] appellant's motion to quash. On May 27, 2014, appellant filed a second motion to quash and exception to form and substance of the amended indictment. Appellant argued that the amended indictment (1) charged him with an additional or different offense, (2) changed the manner and means of how he committed the offense, and (3)

---

[3] Appellant conceded at a pretrial hearing that replacing the pronoun "him" with the victim's name was not a substantial change. Accordingly, the only language at issue is the addition of the following phrase to the murder allegation: "by striking Brandon White, by causing blunt force trauma to Brandon White, by impeding Brandon White's normal breathing by applying pressure to the victim's neck or by blocking the victim's nose or mouth."

prejudiced his substantial rights. On June 12, 2014, the trial court denied appellant's second motion to quash. Appellant's trial commenced on June 23, 2014.

### 2. Standard of review

*HN7* When reviewing a trial court's decision to deny a motion to quash an indictment, we apply a *de novo* standard of review because the sufficiency of the indictment is a question of law. *See State v. Moff, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)*. An indictment is sufficient when it charges the commission of the offense [*41] in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged. *See Tex. Code Crim. Proc. Ann. art. 21.11* (West 2009).

### 3. Analysis

*HN8* *Article 28.10 of the Texas Code of Criminal Procedure* provides that after notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. *See Tex. Code Crim. Proc. Ann. art. 28.10(a)* (West 2006). *Article 28.10* also provides that an indictment may not be amended over the defendant's objection as to form or substance if the amended indictment charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced. *Id.* at *28.10(c)*.

Appellant argues that he was prejudiced by the amended indictment because it charged an additional offense and changed the manner and means of how appellant allegedly committed the offense. We disagree. First, the amended indictment did not charge an additional or different offense. *HN9* The Texas Court of Criminal Appeals has held that a different offense means a different statutory offense. *Flowers v. State, 815 S.W.2d 724, 728 (Tex. Crim. App. 1991)*. Here, the State amended language within the murder count but [*42] did not add a new statutory offense. Second, we conclude that the additional language regarding manner and means in the murder count did not prejudice appellant's rights. Here, the additional manner and means language was based on the same incident forming the basis of the original indictment. *Id.* ("If such amendment is made on the basis of the same incident upon which the original indictment is based, it will, in most cases, be permissible under the substantial rights provision after a review of the record for prejudice."). Appellant does not argue that the amendment impaired his ability to prepare a defense. Accordingly, we overrule appellant's fourth issue.

### E. The Extraneous Offense Was Properly Admitted

Appellant asserts that the trial court committed reversible error when it allowed the State to introduce evidence of extraneous offenses at the punishment phase of trial.

### 1. Additional facts

Prior to the punishment phase of the trial, the State offered two "pen packets" (exhibits 196 (two burglaries and a robbery) and 197 (DUI with injury and possession of cocaine)) to prove up appellant's prior convictions to enhance the punishment range. Appellant objected to the exhibits because: [*43] (1) the pen packets failed to establish that certain offenses resulted in final convictions or were the result of valid waivers of jury trial; (2) the pen packets were missing fingerprint cards; or (3) the State could not establish the statutes under which appellant was convicted were still valid or constitutional. The State argued that the exhibits were "certified pen packs" and were self-authenticating. The trial court removed some documentation from exhibits 196 and 197 but admitted the remainder of the documents subject to the State's ability to prove them up in front of the jury.

### 2. Standard of review

*HN10* A trial court's decision to admit or exclude evidence is viewed under an abuse of discretion standard. *Williams v. State, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009)* ("A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard."); *Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002)*. A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Green v. State, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996)*.

### 3. Analysis

Appellant argued that the trial court erred in admitting appellant's extraneous offenses because the State was unable to establish that: (1) certain prior offenses resulted in convictions; (2) other convictions were the result of a valid waiver [*44] of trial by jury; or (3) the statutes under which appellant was convicted were still valid or constitutional. Appellant references no case law or statute in support of his argument.

*HN11* *Article 37.07 of the Texas Code of Criminal Procedure* provides that evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing including, but not limited to, evidence of an

extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the appellant. *See* TEX. CODE CRIM. PROC. art. 37.07 § 3(a). The State, during the punishment phase, introduced pen packets from the California Department of Corrections which contained abstracts of judgment for each of the prior offenses. Each abstract of judgment referenced a "date of conviction." In addition, the State introduced the interview between appellant and Detective Mackay in which appellant admitted to going to prison in California for "various things" including robbery with a weapon. The State also called Dennis Michael, an investigator with the Grayson County District Attorney, regarding the fingerprints in this case. Michael testified that he took appellant's fingerprints and compared them to the fingerprints found in exhibits 196 and 197 and the exhibits [*45] contained the fingerprints of appellant. On the basis of the record before us, we cannot conclude that the trial court abused its discretion in admitting the pen packets and, accordingly, we overrule appellant's fifth issue.

## F. The Motion to Suppress Was Properly Denied

Appellant asserts that the trial court committed reversible error when it denied his motion to suppress appellant's statements to the police because they were custodial and involuntary and taken without the proper waiver of Miranda rights.

### 1. Additional facts

Appellant spoke with the police twice during the early morning hours of January 8, 2013, and again after his arrest on January 9, 2013. On May 7, 2014, appellant filed a motion to suppress these oral statements. The trial court held a hearing on May 14, 2014, and the following witnesses testified: (1) Detective Watt; (2) Officer Hayth; (3) Detective Mackay; (4) appellant; and (5) Dr. Keenan.

Detective Watt testified that he first made contact with appellant on January 8, 2013, at appellant's home because he was called to the scene to investigate a suspicious death. Detective Watt spoke with both appellant and Holly in a bedroom to determine what had happened. Detective [*46] Watt testified that appellant was not in handcuffs or custody. Detective Watt testified that he did not tell appellant that he could not leave and appellant could have left out the back door of the bedroom. This initial conversation lasted approximately two and a half minutes and was recorded. Detective Watt was also present during the January 9th interview of appellant along with Detective Mackay. Detective Watt testified that Detective Mackay read appellant his Miranda rights prior to the interview. Detective Watt testified that appellant voluntarily spoke with the detectives until the end of the questioning when he asserted his right to an attorney.

Officer Hayth testified that on January 8th he approached appellant in the back bedroom and asked him to come to the police station with him. Appellant agreed to go to the police station. Officer Hayth testified that appellant could have declined to give a statement. Officer Hayth further testified that appellant was not under arrest or handcuffed and that he sat in the front of the unmarked car with him.

Detective Mackay testified that he first spoke with appellant around 6:00 a.m. on January 8, 2013, at the police station. Detective [*47] Mackay testified that he told appellant that he was free to leave and did not place appellant in handcuffs or threaten appellant. This interview lasted approximately an hour and a half and Detective Mackay testified that appellant's statement was voluntarily and knowingly given. The interview was recorded. Detective Mackay also spoke with appellant on January 9th following his arrest. This interview was also videotaped. Detective Mackay read him his Miranda warning and this was contained on the videotape. Appellant waived his rights and agreed to speak with him until he asserted his right to an attorney at which point the interview ceased.

Appellant testified at the hearing that on January 8th he did not feel like he was free to leave his house or to refuse to go to the police station. Appellant testified that he was very tired at the time of the January 8th interview. Dr. Charles Keenan, a psychologist, testified for the defense that appellant was sleep deprived and stressed during the January 8th interview and lacked the capacity at that time to appreciate his legal situation or invoke his Miranda rights. For this reason, Dr. Keenan concluded that appellant's statements on January [*48] 8th were not voluntary.

On June 3, 2014, the trial court agreed to suppress certain portions of the January 8th videotaped interview relating to appellant's prior drug use and convictions, but denied appellant's request to suppress the statements in their entirety. The trial court also made the following findings of fact:

1. Detective MacKay (MacKay) interviewed Robert James Gray, Jr. (Gray) on January 9, 2013 about 6:00 a.m. at the Denison Police Department.[4]

2. MacKay told Gray he was not under arrest nor being detained and he was free to leave at any time.

3. Gray said he understood that.

4. The interview lasted 1 1/2 hours.

5. Gray was not Mirandized.

6. In explaining what happened Gray mentioned that he had only had a little sleep.

7. Gray never said he was too tired for the interview.

8. Gray never asked to stop the interview to get any sleep.

9. Gray never asked for a break.

10. Gray asked for water which was provided to him.

11. After he asked for a glass of water Gray asked the question, "I come with you?", to which MacKay replied, "I will bring you a cup."

12. Gray then thanked MacKay.

13. Gray responded to MacKay's questions.

14. At the time of the interview a cause of death had not been [*49] determined.

15. Gray indicated it would show natural causes.

16. MacKay said it would not show natural causes and that he did not think Gray was telling him everything.

17. Gray's story of what happened was consistent throughout the interview.

18. After Gray was later arrested another interview took place with MacKay and Detective Watts [sic].

19. Prior to the second interview Gray was given his Miranda warnings by MacKay.

20. Later in the interview Gray asked for an attorney and the interview ceased.

Based on these findings of fact, the trial court concluded:

1. The first interview was not custodial.

2. The second interview was custodial and Gray was Mirandized.

3. Both interviews and Gray's statements therein were voluntary.

## 2. Standard of review

*HN12* We apply a bifurcated standard of review of a trial court's ruling on a motion to suppress by giving almost total deference to the trial court's determinations of fact and reviewing *de novo* the trial court's application of law. *State v. McLain, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011)*.

## 3. Analysis

The record supports the trial court's findings of fact. Appellant agreed to speak with [*50] Detectives Watt and Mackay. Appellant was not placed in handcuffs and agreed to go to the police station to give his statement. Appellant rode in the front seat of the unmarked police car. In regard to the January 8, 2013 interview, Detective Mackay testified that he told appellant that he was free to leave and did not place appellant in handcuffs or threaten appellant. As for the January 9, 2013 interview, Detective Mackay read appellant his Miranda warnings and appellant waived his rights and agreed to speak with the detective until he asserted his right to an attorney at which point the interview ceased. Therefore, we conclude that the trial court properly admitted the three oral statements by appellant and we overrule appellant's sixth issue.

## III. CONCLUSION

We resolve appellant's issues against him and affirm the trial court's judgment.

/s/ David Evans

DAVID EVANS

JUSTICE

Do Not Publish

*TEX. R. APP. P. 47*

## JUDGMENT

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. Judgment entered this 18th day of November, 2015.

---

[4] The trial court's first finding of fact appears to mistakenly state January 9, 2013, when it should have been January 8, 2013.