

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
## NO. PD-0776-19
---

### SAMUEL UKWUACHU, Appellant

### v.

### THE STATE OF TEXAS

---
## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE TENTH COURT OF APPEALS
## MCLENNAN COUNTY
---

SLAUGHTER, J., delivered the opinion of the Court in which KEASLER, RICHARDSON, YEARY, and KEEL, JJ., joined. KELLER, P.J., and HERVEY, NEWELL, and WALKER, JJ., concurred.

## O P I N I O N

It is axiomatic that a due process claim based on false evidence requires the defendant to prove first and foremost that the evidence was actually false. *Ex parte Weinstein,* 421 S.W.3d 656 (Tex. Crim. App. 2014). In the instant case, the court of appeals reversed Appellant's conviction for sexual assault by concluding that the State improperly

used cell-phone call and location records to impeach two defense witnesses, thereby resulting in the introduction of false evidence in violation of his due process rights. Yet, the phone records at issue were never admitted into evidence nor made part of the record. Further, no expert testimony was introduced to establish that the State misled the jury regarding any particular information shown in the records. Without these phone records or such expert testimony, Appellant cannot prove that the State actually elicited witness testimony that conflicted with the substance of those records. Accordingly, Appellant has failed to make the requisite showing of falsity that must underlie any false-evidence due process claim. We, therefore, reverse the judgment of the court of appeals granting Appellant a new trial, and we remand this case for consideration of Appellant's remaining issues on appeal.[1]

## I.      Background and Procedural History

In 2014, Appellant was indicted for sexually assaulting a college classmate, Krystal.[2] The record showed that the two had met in class and spent time together on

---

[1] This is the second time this Court has granted the State's petition for discretionary review in this case. We previously granted review following the court of appeals' earlier reversal of Appellant's conviction based on its conclusion that the trial court had erroneously excluded from evidence certain records of text messages between the victim and a friend during the time leading up to the assault. *Ukwuachu v. State*, No. 10-15-00376-CR, 2017 WL 1101284 (Tex. App.—Waco March 22, 2017) (mem. op., not designated for publication). On review of that decision, we reversed the court of appeals' judgment and remanded for consideration of Appellant's remaining points of error. *Ukwuachu v. State*, No. PD-0366-17, 2018 WL 2711167, at *4 (Tex. Crim. App. June 6, 2018) (plurality op., mem. op., not designated for publication). On remand, the court of appeals once again reversed Appellant's conviction based on the introduction of false evidence at his trial. *Ukwuachu v. State*, No. 10-15-00376-CR, 2019 WL 3047342 (Tex. App.—Waco July 10, 2019) (mem. op., not designated for publication). It is this opinion after remand that is at issue in this proceeding.

[2]  Aside from identifying her as "Jane Doe" in the indictment, it does not appear that the complainant in this case has been assigned any pseudonym thus far in the proceedings to protect her confidentiality. We assign her the pseudonym above for that purpose.

several occasions before the incident in question, with some suggestion that there was a romantic interest forming between them.

At Appellant's jury trial, it was undisputed that he and Krystal had sex on the night in question. Therefore, the sole contested issue at trial was consent. Krystal testified that on the night of the offense, she and Appellant had seen each other at a party and agreed to meet afterwards. Shortly thereafter, Krystal called Appellant to let him know that she was home. Appellant picked her up from her apartment a little after 2 a.m. Although Krystal believed they were going to another party or to get something to eat, Appellant instead took her back to his apartment. Once there, they went into his bedroom where, after a short time, Appellant forced himself upon Krystal and raped her. She testified that she repeatedly screamed "no" and "stop." Krystal believed that if anyone else had been in the apartment at the time, he or she would have heard the screams. She further testified that she knew Appellant had a roommate, but she believed that she and Appellant were alone in the apartment during the offense.

Following Krystal's testimony, on the second day of trial, the State informed defense counsel that it had just that morning obtained the cellular phone records of Appellant's roommate, Peni Tagive, from the night of the offense. Tagive was expected to testify, consistent with his grand jury testimony, that he had been home in his room at the time of the alleged offense and had not heard any screams or sounds of a struggle coming from Appellant's bedroom.[3]

---

[3] The record indicates that Appellant and Tagive shared a two-bedroom apartment, with each having their own bedroom separated by a shared living room / kitchen area.

In a discussion outside the jury's presence, the State told the court that its designated expert reviewed Tagive's cell phone call and location records. The expert noted that the records conflicted with Tagive's grand jury testimony that he was home asleep by around midnight or 12:30 a.m. on the night of the offense. Instead, according to the State, the records showed that Tagive was "making calls all night and his phone bounces around at different [cell] towers in town." In light of this information, Tagive's attorney informed the prosecutor that Tagive "might take the Fifth."[4] Defense counsel asked for and was granted a recess for the remainder of the afternoon to review the records and speak to Tagive.

The following morning, defense counsel filed a motion in limine regarding the State's use of Tagive's phone records. Counsel asserted that the State had failed to provide timely notice of its intention to admit business records and that there was no live witness to sponsor the records. He also urged that the time stamps in the records were "based on time zones that were five hours off." This time difference, he argued, meant that the State's interpretation of the records was incorrect and did not prove inaccuracies in Tagive's grand jury testimony. In response, the State acknowledged the time zone issue and asserted that, even if the time stamps were off by five hours, the adjusted time stamps and location data were still in conflict with Tagive's prior statements regarding his whereabouts at the time of the offense.

---

[4] Tagive had retained an attorney to represent him after he was arrested following his earlier failure to appear before the grand jury. Tagive eventually did appear before the grand jury and gave testimony favorable to Appellant's defense, as indicated above.

The trial court ruled the phone records inadmissible because the State had not timely filed notice of its intent to introduce business records. But, the trial court also agreed that the State could ask Tagive "if he was making phone calls" on the night of the offense.

The trial proceeded with the testimony of Tagive, as well as Tagive's friend, Morgan Reed, who had given him a ride home on the night in question. Tagive and Reed provided largely consistent timelines of the events that night. Sometime shortly after midnight, Tagive called Reed to ask for a ride home from a party. At approximately 12:30 a.m., Reed picked up Tagive, went through a fast-food drive-thru, and then drove Tagive home to his apartment. Appellant was not home when Tagive and Reed arrived. Reed testified that she left the apartment between 1:00 and 1:30 a.m., and Tagive testified that he then went to bed. Tagive later heard Appellant talking to a female in the living room. When the voices stopped, Tagive assumed that the two had gone into Appellant's bedroom. Tagive testified he never heard any screaming or sounds of a struggle. He stated that he was a light sleeper and would have heard such noises coming from Appellant's bedroom.

On cross-examination, the State attempted to impeach Tagive and Reed's testimony by alluding to inconsistencies allegedly shown by Tagive's phone records. For example, the prosecutor asked Reed "why [her] phone records show [Tagive] called you at one o'clock from across town from his apartment?" Reed responded, "I don't believe that's true." The State pressed Reed further, asking her why her timeline didn't "match up" with the phone records regarding when and from where Tagive had called her that night.[5] Reed

---

[5] The following exchange occurred between Reed and the prosecutor:

Q:    Okay, ma'am. He [Tagive] made calls at one o'clock from across town. Would you like to tell this jury why that doesn't match up to your statement?

maintained that she was being truthful in her testimony and that her timeline was not inconsistent with the phone records. But she also conceded that she may have picked up Tagive from the party as late as 1 a.m. and that she was not sure of the exact time she dropped Tagive off, but believed it was between 1:00 and 1:30 a.m.

Similarly, while cross-examining Tagive, the State pointed out that Tagive told investigators and the grand jury that he was home and in bed by midnight or 12:30 a.m. on the night of the offense. In response, Tagive indicated that he was not sure of the exact times and his recollection of the timeline was only an estimate. The following exchange then occurred:

> [State]  Now, you know we got your phone records.
> [Tagive]  Yes, sir.
> [State] You know your phone records show you were across town at one o'clock in the morning and you were making calls to [Reed] at one o'clock in the morning.
> [Tagive] Yes, sir.
> [State] Okay. You know your phone call . . . records also show you were making a call around 2:00 in the morning.
> [Tagive] Yes, sir.

---

A:      I believe it does.
Q:      So if he's calling you from his apartment at one o'clock and you're there.
. . .
Q:      Tell this jury why that doesn't match up.
A:      Honestly, it was two years ago. I could have picked him up at 1:00.
Q:      Well, no, you're calling him at 12:30 as well. Why are you still calling him at 1:00?
A:      I had a recruit with me that night and I think that he called me multiple times. I wasn't on my phone.
Q:      No. I'm talking about calls between you and [Tagive].
A:      Yeah. I'm saying that I think he called me multiple times before I answered. We had a few calls, like calls going back and forth. . . .
Q:      Yeah, I understand that. Hold on. But if you're with him at 1:00, why is he calling you?
A:      I'm saying—
Q:      You told this jury you were out of there by 1:00 to 1:30. Why is he still calling you? Because you said you went to get something to—something to eat in that time period. Would you like to tell the jury about this?
A:      I'm telling the truth.
Q:      It doesn't match the facts.

Notably, during the State's cross-examination of Tagive and Reed, defense counsel did not raise any objections to the State's use of the unadmitted phone records. The only objection defense counsel raised occurred during the cross-examination of Reed, when counsel at one point objected to the State's repetitive questioning of Reed on an issue that had been "asked and answered." The jury ultimately convicted Appellant and sentenced him to eight years' imprisonment. Upon the jury's recommendation, the trial judge suspended imposition of the sentence and placed Appellant on community supervision for a period of ten years.

### Motion for New Trial

Following his conviction, Appellant filed a motion for new trial in which he contended, among other things, that the State improperly used the unadmitted phone records to impeach Tagive at trial. Specifically, Appellant contended that the State's use of the phone records "without authentication, introduction into evidence, or use of a witness qualified to interpret the records . . . created a false image to the jury that was reckless on the part of the State." In support of this claim, Appellant submitted an affidavit from Tagive indicating that, after the State received the phone records and confronted Tagive about the alleged inconsistencies, Tagive's attorney reviewed the records and determined "that the times listed on the telephone records were being misinterpreted and that the records matched with [Tagive's] version of the events." Tagive further stated that he testified truthfully at Appellant's trial regarding the timeline of events.[6]

---

[6] Appellant also submitted an affidavit from Tagive's attorney, which stated, "Upon review of the records, it was determined that the times shown on the records were not based on central daylight time. Once a proper conversion was made, the records would otherwise match with the events related by my client, Mr. Tagive."

Appellant also submitted an affidavit from Dan James, a computer forensic investigator who reviewed Tagive's phone records. James stated that the call times listed in the records were stored and displayed in "UTC" (Coordinated Universal Time) and that a conversion to Central Daylight Savings Time would require an adjustment of six hours. Thus, according to James, the times reflected on the records would have to be adjusted by six hours earlier than the time indicated in order to convert the recorded time to the local time in Waco on the night of the offense.[7] Regarding the records' location data, James stated:

> [T]he longitude and latitude figures provided on the mobility usage, in my experience, are rarely accurate. Those figures cannot be relied upon to accurately provide locations of cell towers used to connect the calls. In my experience it would take an expert to spend a number of hours to evaluate the records and cell tower locations in order to make a final determination of whether the longitude and latitude listed is accurate. Without the proper training and expertise necessary in order to properly evaluate the accuracy of these records, any use of those records would be reckless and without any factual basis.

The trial court held a hearing on Appellant's motion for new trial. No witnesses relevant to these claims were called to testify. In his arguments to the court, Appellant asserted based on James's affidavit that it was "impossible to demonstrate in that short

---

[7] In this portion of his affidavit regarding the time zone issue, James stated,

> An examination of the records provided pursuant to the search warrant begins by clearly stating that the call times were stored and displayed in UTC. UTC is a primary time standard by which the world regulates clocks and time. A conversion from UTC to Central Daylight Savings Time would be a difference of 6 hours. Therefore, when analyzing the records provided by AT&T for [Tagive's] cellular number [ ], the times reflected on the records would have to be adjusted by 6 hours earlier than the time stated in order to convert the connection time to that time in Waco, Texas, on October 20, 2013.

amount of time [after the State received the records] where these calls were being made from." Appellant pointed out that the records had not been admitted, nor was there an expert "to sponsor those [records] or to demonstrate the times or locations of any of the calls, but yet [the records] were still used during . . . cross-examination of [Tagive]."[8] In response to Appellant's arguments, the State asserted that because the records were used solely for impeachment purposes and Tagive admitted to making the calls, it was unnecessary for the records themselves to be admitted or authenticated by an expert. Further, regarding the time stamps not matching the local time zone, the State asserted that the parties at trial "were aware" of the difference in time zones, and "it did not affect the testimony." The State contended that "[n]o incorrect times were given before the jury." The trial court denied Appellant's motion for new trial without comment and without entering any findings of fact or conclusions of law.

### Court of Appeals' Opinion

On direct appeal, Appellant raised six issues, including that the State's use of Tagive's unadmitted phone records to cross-examine Tagive and Reed "created a false impression with the jury" and thus violated Appellant's due process rights.[9] The court of

---

[8] We note here that, by the time of his motion for new trial, Appellant was being represented by new appellate counsel. Counsel indicated to the trial court during the hearing that he did not have access to the trial record, presumably because the record had not yet been prepared. Thus, counsel would not have had any knowledge of the exact manner in which the State used the phone records to impeach Tagive at trial (e.g., actual questions asked and answers given regarding call times / locations). Counsel's uncertainty in this regard is reflected in the record from the motion for new trial.

[9] Specifically, Appellant argued that because the phone records had not been admitted into evidence or properly analyzed by an expert, the State's suggestion during cross-examination that the records established the untruthfulness of Tagive's and Reed's testimony was wholly unsupported by any facts and was misleading. *See* Appellant's Amended Brief to Court of Appeals

appeals agreed, concluding that the State's use of Tagive's phone records amounted to false evidence that materially affected the outcome of Appellant's trial. *Ukwuachu v. State*, No. 10-15-00376-CR, 2019 WL 3047342, at *2 (Tex. App.—Waco July 10, 2019) (mem. op., not designated for publication). The court reasoned that "the State referred to the phone records as though they definitively showed that [Appellant's] roommate was calling his friend from across town during the time when the roommate testified he was in the apartment he shared with [Appellant]." *Id.* at *2-3. The court also relied upon the affidavit from Dan James, observing that it "contended that it was impossible to accurately verify location data solely from the records without additional review by an expert, that the latitude and longitude on this type [sic] phone records was rarely precisely accurate, and that it would take many hours for an expert to accurately provide the location of where an individual was when a call was made." *Id.* at *3. Regarding the falsity prong of a false-evidence claim, the court of appeals concluded,

> We find that the State's repeated references to what the cell phone records showed, including the location and time of calls made, without their admission into evidence created a false impression with the jury. Testimony was elicited from both Ukwuachu's roommate [Tagive] and Ukwuachu's roommate's friend [Reed] while referencing records that were not in evidence and in a manner that indicated that the records definitively showed Ukwuachu's roommate's location at certain critical times when they did not.

---

on Remand, at 20-21 (noting that the phone records "were not introduced into evidence nor substantiated as to the location of a telephone at the time a call or text was generated;" thus, the cross-examination of Tagive and Reed "created a false impression with the jury that [Tagive] was placing a call or text to [Reed] from a location other than his apartment. No such evidence of the location of [Tagive's] telephone was ever introduced into evidence during trial."). The law cited by Appellant in support of his claim was this Court's precedent addressing due process violations stemming from the use of false evidence to procure a conviction. *See id.* at 25-26 (citing *Ex parte Weinstein,* 421 S.W.3d 656, 664 (Tex. Crim. App. 2014); *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011)).

*Id*. The court of appeals went on to determine that the false evidence was material, such that its introduction warranted a new trial. *Id.* at *3-4.

Following the court of appeals' decision, we granted the State's petition for discretionary review to address a single issue: "Can you have a 'false testimony' claim without testimony or falsity?"

## II. Analysis

A false-evidence claim must be supported by facts showing that some evidence was presented to the jury that was demonstrably false or misleading. *Ex parte De La Cruz,* 466 S.W.3d 855, 866 (Tex. Crim. App. 2015). In this case, the court of appeals concluded that the prosecutor's unobjected-to cross-examination questions which referenced the cell phone records led to false evidence being presented to the jury. But the record includes neither the phone records at issue nor any credible expert testimony identifying actual inconsistencies between those records and the witness testimony presented at trial. Thus, the court of appeals erred in its holding because there is no proof that the State actually elicited or presented any false evidence.[10]

### A. A false-evidence claim requires demonstrably false evidence.

---

[10] We note here that the court of appeals did not consider whether Appellant's false evidence complaint was preserved with a timely objection at trial. In at least one prior decision, this Court has considered the merits of an unpreserved false evidence complaint raised on direct appeal where the defendant "had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made." *Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010). Although we could plausibly remand this case to the court of appeals for an analysis of whether preservation requirements were met here, because we find the resolution of the merits to be more straightforward, we will assume without deciding that the claim was preserved and address the merits.

The use of material false testimony to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. *Ex parte De La Cruz,* 466 S.W.3d at 866. Therefore, in any claim alleging the use of material false testimony, a reviewing court must determine: "(1) whether the testimony was, in fact, false, and, if so, (2) whether the testimony was material." *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). Because only the first prong is at issue in this case, we focus the remainder of our discussion on the matter of falsity.

In examining the requirements for establishing falsity in this context, we have repeatedly indicated that the proper inquiry is "whether the particular testimony, taken as a whole, 'gives the jury a false impression.'" *Id.* at 666 (quoting *Ex parte Chavez,* 371 S.W.3d 200, 208 (Tex. Crim. App. 2012)); *see also Ex parte Chaney,* 563 S.W.3d 239, 263 (Tex. Crim. App. 2018) ("Whether evidence is false turns on whether the jury was left with a misleading or false impression after considering the evidence in its entirety."); *Ex parte Ghahremani,* 332 S.W.3d 470, 477 (Tex. Crim. App. 2011) ("It is sufficient if the witness's testimony gives the trier of fact a false impression.") (internal quotation marks and citations omitted). We have observed that the testimony "need not be perjured" and that a witness's good or bad faith is irrelevant to establishing falsity. *Weinstein*, 421 S.W.3d at 666; *Chavez*, 371 S.W.3d at 208. This is true because a false-evidence due-process claim is "not aimed at preventing the crime of perjury—which is punishable in its own right—but [is] designed to ensure that the defendant is convicted and sentenced on truthful testimony." *Weinstein*, 421 S.W.3d at 666 (quoting *Chavez*, 371 S.W.3d at 211 (Womack, J., concurring)).

To prove the falsity prong of a false-evidence claim, the record must contain some credible evidence that clearly undermines the evidence adduced at trial, thereby demonstrating that the challenged evidence is, in fact, false. *See, e.g., Weinstein,* 421 S.W.3d at 666 (finding that mental health records demonstrated that witness gave false testimony at trial about whether he had ever experienced hallucinations); *Chavez*, 371 S.W.3d at 208 (concluding that another person's confession to shooting the victim during armed robbery demonstrated that witnesses had provided false testimony at defendant's trial by identifying him as the shooter); *Ghahremani*, 332 S.W.3d at 478-79 (determining that police reports indicating that minor sexual assault victim had been assaulted by others and had abused drugs demonstrated falsity of parents' testimony that victim's need for intensive mental health treatment was caused solely by defendant's abuse of victim); *Estrada v. State,* 313 S.W.3d 274, 286 (Tex. Crim. App. 2010) (taking judicial notice of prison regulation regarding classification system for incarcerated capital murderers, and holding that regulation was sufficient to establish falsity of contradictory expert testimony at trial). Thus, while "various types of evidence . . . may serve to demonstrate the falsity of evidence introduced at trial," our cases have been consistent in signaling that to meet the falsity prong, some "definitive or highly persuasive evidence" is needed to undermine the truthfulness of the evidence adduced at trial. *De La Cruz*, 466 S.W.3d at 867.

### B.    The record fails to establish that Tagive or Reed provided any false testimony.

The basis for Appellant's false-evidence claim is that the State misled the jury by referring to the unadmitted phone records during its cross-examination and argument in a manner that suggested Tagive and Reed were lying about their whereabouts on the night

of the offense. This type of assertion, while perhaps suggestive of some other type of complaint,[11] does not fall within the scope of our false-evidence jurisprudence. As explained above, the law governing the falsity prong of a false-evidence claim requires both an allegation of falsity of some particular testimony and proof of that falsity with highly persuasive evidence that undermines the evidence presented at trial. *See Weinstein*, 421 S.W.3d at 666; *De La Cruz*, 466 S.W.3d at 867. Here, Appellant has satisfied neither requirement. He points to no specific testimony from any witness that actually left the jury with a false impression. Instead he focuses his complaint on the State's questions and arguments that were allegedly misleading by suggesting that Tagive and Reed were lying. Likewise, in its false evidence analysis, the court of appeals also focused on the State's questions and arguments about the phone records, rather than identifying any particular testimony that misled the jury. *See Ukwuachu,* 2019 WL 3047342, at *2-3 (taking note of the State's repeated references to the unadmitted records "as though they definitively showed" inconsistencies between Tagive's testimony and his actual whereabouts, and concluding that such references by the State "created a false impression with the jury").

---

[11] Of course, a prosecutor's reference to facts not in evidence in a manner that prejudices the defense may constitute reversible error. *See, e.g., Freeman v. State,* 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) (noting, in the context of improper closing argument, that a prosecutor's "[i]mproper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate"). Likewise, improper prosecutorial questioning of witnesses may rise to the level of a due process violation in some instances. *See Greer v. Miller,* 483 U.S. 756, 765 (1987) (observing, in context of claim of improper questioning by prosecutor, that "prosecutorial misconduct may so infect the trial with unfairness as to make the resulting conviction a denial of due process"). Though it appears that Appellant's complaint would fit more neatly within this category of prosecutorial-misconduct type complaints, we are bound by our procedural rules to consider the complaint that was actually raised by Appellant and considered by the court of appeals. *See* TEX. R. APP. P. 38.1(i), 66.3.

But a prosecutor's questions of a witness and his arguments to the jury are not "evidence" within the meaning of a false-evidence claim.[12] *See, e.g., Coble v. State*, 871 S.W.2d 192, 206 (1993) (finding that a jury argument "is not considered evidence"); *Barrientez v. State*, 487 S.W.2d 97, 101 (Tex. Crim. App. 1972). Given our precedent's focus on "testimony" or "evidence" that leaves the jury with a false impression, we cannot sustain a false evidence claim based solely on an allegation of misleading prosecutorial questioning absent some identifiable testimony that was problematic.

Even if Appellant had properly focused only on the testimony of Tagive or Reed as the basis for his false evidence complaint, nothing in this record credibly shows that Tagive or Reed misinformed the jury on any particular facts.[13] At trial, Tagive and Reed were both largely unwavering in their testimony. They both maintained they were telling the truth about the time that they arrived at the apartment, even when faced with aggressive questioning by the State suggesting that the phone records showed otherwise. Further,

---

[12] At the close of voir dire, the trial court informed the jury that the lawyers' opening and closing statements "are not evidence but are made to help you understand the nature of the case and the evidence that will be presented." The court then continued, "Your oath states that you will render a verdict only on the evidence submitted to you under my rulings. The evidence you may consider will consist of the testimony of witnesses either in person or through written transcripts of their testimony called depositions. Evidence will also be presented in the form of physical objects of documents called exhibits." These statements indicate that the jury was aware that the State's assertions and questions to witnesses did not constitute evidence upon which Appellant could properly be convicted.

[13] Appellant's brief states, "The issue decided in the instant case is a false impression *created by the prosecutor* during testimony of Defense witnesses at guilt-innocence. The false impression was that the *prosecutor knew* what the non-evidentiary records showed and that the witnesses' testimony was false. *This assertion by the prosecutor* was done without any factual basis in the record." Appellant's brief on discretionary review, at 11-12 (emphasis added); *see also id.* at 14 (describing the issue in this case as "the use of the unadmitted phone records by the prosecutors by implying that they were evidence of the untruthfulness of the witness[es] Reed and Tagive").

even if isolated portions of Tagive and Reed's testimony could be interpreted as agreeing with the State's alternative timeline of events based on the phone records,[14] Appellant has not pointed to any credible evidence showing that the State's interpretation of the records was incorrect. We actually have no way of knowing what the phone records show because they were never admitted into evidence at trial, nor were they made part of the record. Appellant did not offer those records at the motion for new trial hearing. Because we cannot know what information the phone records would ultimately reveal, we are precluded from finding that the State misrepresented the contents of those records during its questioning.

Additionally, Appellant did not present any expert testimony analyzing the State's use of the phone records to prove that the State elicited false or misleading testimony from Tagive and Reed. We have only the affidavit from Dan James, submitted in conjunction with Appellant's motion for new trial. But James's affidavit merely calls into question the State's reliance on the cell phone records. It does not establish that any particular false testimony was elicited. Specifically, James's affidavit takes note of the difference in time zones between UTC (which was reflected in the records) and Waco Daylight Savings Time on the night of the offense. He opines that an adjustment of six hours would be required to align the time stamps in the records with the local time zone. But James's affidavit does not expressly indicate that the State failed to properly account for the difference in time zones. And the State acknowledged the time zone issue at trial (even though it, as well as

---

[14] For example, at one point during his testimony, Tagive agreed with the State's assertions that the records showed he was "across town" making calls to Reed at 1 a.m., which was after the time he reported arriving at home. In other places, the witnesses conceded, when pressured by the State, that they were not entirely certain about the timeline of events given the information shown in the records.

defense counsel, suggested during discussions with the trial court that an adjustment of only five hours was proper) and claimed that it had made the necessary adjustments.[15] Even if we were to conclude that the difference between the five-hour and six-hour adjustment rendered the State's timeline of events unreliable, we reiterate that the absence of the cell phone records themselves or any expert testimony identifying actual inconsistencies between the testimony and the records prevents us from determining falsity. Thus, Appellant has not identified any "testimony" that meets the requisite definition for falsity resulting from failure to properly adjust the time zones.

James's affidavit also generally questions the State's ability, without the aid of an expert, to rely on longitude and latitude figures provided in the phone records to pinpoint Tagive's location at the time of his calls. James suggests that without the proper training, such use of the records would be "reckless and without any factual basis." But the State asserted at trial that its expert had, in fact, examined the records prior to the State using them. And, similar to our reasoning above, James does not point to any particular instances in the record where the State was ultimately mistaken about Tagive's whereabouts at the times of the calls. Because James did not perform any detailed review of the records or compare the records to the State's assertions or Tagive's and Reed's testimony, his affidavit establishes only that the State's use of the records *could have* led to inaccuracies.

---

[15] Although the State and defense counsel at trial discussed a five-hour difference between UTC and local time, as opposed to the six-hour difference identified by James, it is nevertheless unclear whether the State's expert who examined the records and advised the State on the locations and times of the calls applied a five- or six-hour time adjustment. Thus, it is possible that the State's expert also applied the six-hour adjustment and advised the State accordingly. In any event, because the State's expert did not testify and the records were not admitted, we again have no way of knowing whether a five or six hour adjustment was proper or whether the State's expert correctly advised it regarding the information shown in the records.

That is not the same thing as establishing that false or misleading testimony was actually placed before the jury. Therefore, because James's affidavit merely calls into question the reliability or accuracy of the State's methods without refuting any particular assertions or evidence elicited based on the records, it falls short of establishing that the State's use of the records resulted in false testimony. Appellant has presented no other evidence that could be construed as demonstrating the falsity of any assertions by the State or testimony resulting therefrom. Accordingly, because the record does not contain any evidence that persuasively undermines the evidence adduced at trial, Appellant cannot satisfy the falsity prong of a false-evidence claim. *See De La Cruz,* 466 S.W.3d at 867.

## III.   Conclusion

The court of appeals erred by applying false-evidence principles to conclude that the instant record established that any false or misleading testimony was placed before the jury. We, therefore, reverse the judgment of the court of appeals granting Appellant a new trial on that basis, and we remand this case to that court for consideration of Appellant's remaining points of error.

Delivered: November 18, 2020
Publish